**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Leon STAMPER, Jr., Defendant–**
**Appellant.**

**No. 02–6389.**

United States Court of Appeals,
Sixth Circuit.

March 3, 2004.

Before KENNEDY, DAUGHTREY, and COLE, Circuit Judges.

KENNEDY, Circuit Judge.

Defendant Leon Stamper, Jr. ("defendant") was convicted of: 1) car-jacking in violation of 18 U.S.C. § 2119; 2) obstructing interstate commerce by robbery in violation of 18 U.S.C. § 1951(a); 3) brandish-

ing a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii); 4) possessing a firearm while being a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and 5) transporting interstate a stolen motor vehicle in violation of 18 U.S.C. § 2312. The district court sentenced defendant to 360 months of imprisonment. Defendant appeals his judgment of conviction and sentence on several grounds. For the reasons explained below, we AFFIRM the judgment of conviction, but REVERSE defendant's sentence and REMAND for re-sentencing consistent with this opinion.

## I. Background

On the morning of July 22, 2000, defendant Stamper arrived at the Okolona Auto Mart, a used car dealership in Louisville, Kentucky. Falsely identifying himself as "Rob Love," defendant asked Jeff Cochran ("Cochran"), a 65 year-old salesman, about test-driving a 1996 red Pontiac Trans Am. Defendant informed Cochran that, in the black fanny pack around his waist, he had $5,000 in cash for a down payment on the car. Cochran accompanied defendant on his test drive of the Trans Am. Upon stopping the vehicle at a convenience store in Bullitt County, Kentucky, defendant removed a small caliber pistol from his fanny pack and pointed it at Cochran. Defendant told Cochran something like, "Old man, sit over there and don't say a word."

Continuing to hold Cochran at gunpoint, defendant left the convenience store and drove down a country road, where he forced defendant to exit the car to "take a walk." Cochran pleaded for his life, told defendant that he had suffered two previous heart attacks, and begged defendant to take the vehicle and leave. Defendant grabbed Cochran by the arm and dragged him up a hill into a wooded area. While walking through the woods, Cochran sur-

reptitiously dropped his wallet on the ground. After stopping well into the wooded area, defendant removed work gloves, black electrical tape, and handcuffs from his fanny pack. Defendant handcuffed Cochran's hands behind his back, gagged him, and bound his mouth and legs with the electrical tape. When defendant could not find Cochran's wallet in his back pockets, defendant kicked him in the back. Leaving Cochran in the woods, defendant fled in the Trans Am.

Approximately an hour later, Cochran unbound his legs and sought help from a nearby house. After un-taping defendant's mouth and removing the gag from it, occupants of that house contacted the police. Deputy Scott McGaha ("Deputy McGaha"), with the Bullitt County Sheriff's Department, responded to the call. Upon removing Cochran's handcuffs, Deputy McGaha observed wounds on Cochran's wrists. Documenting Cochran's injuries, Deputy McGaha photographed Cochran's face, arms, back, and legs. While E.M.S. examined him, Cochran declined medical treatment at that time. Later that evening, Cochran became dizzy and went to a local hospital.

Driving the stolen Trans Am, defendant joined Rachel Bonapfel ("Bonapfel"), his longtime partner, and their two children some time after the car-jacking. Defendant, Bonapfel, and the children traveled across the country in the Trans Am, staying in inexpensive motels, where they paid in cash. At these motels, Bonapfel always registered in her name because defendant had warrants for his arrest on unrelated charges. While traveling, Bonapfel, using a disposable camera, took pictures of defendant driving the vehicle in various parts of the country.

On September 16, 2000, defendant, Bonapfel, and their children were staying in room number 55 at the Sunset Motel in

Grandview Plaza, Kansas, located in Geary County. In the early morning of September 17, 2000, Deputy John Thomas ("Deputy Thomas"), with the Geary County Sheriff's Department, was at the Sunset Motel, assisting Officer Rick Parsons ("Officer Parsons"), with the Grandview Plaza Police Department, in an unrelated investigation. Upon noticing the red Trans Am, which was parked directly outside room 55, Deputy Thomas ran a NCIC check on the license plate number through dispatch. According to the check, the license plate number was stolen and did not match the Trans Am. Deputy Thomas then ran a check on the Trans Am's Vehicle Identification Number. The check revealed that the Trans Am had been stolen in an armed robbery and, thus, that an occupant of the vehicle was probably armed. Deputy Thomas checked with the motel desk clerk to confirm that the Trans Am was associated with the individuals registered in room 55. The registration card for room 55 listed Bonapfel's name and home address. Deputy Thomas called dispatch for back-up assistance. Deputies Kratz and Wolfe of the Geary County Sheriff's Department arrived ten to fifteen minutes later. Deputy Thomas directed Deputy Kratz to go to the rear of the motel to secure a corridor connecting room 55–and other rooms at the front of the motel–with rooms at the back of the motel. While Deputies Thomas and Wolfe obtained the pass key for room 55 from the management office, Officer Parsons stood outside room 55 to secure it.

Without knocking, Officer Parsons opened the door with the pass key, breaking the chain lock that prevented him from fully opening the door. Identifying themselves as law enforcement, Officer Parsons and Deputies Wolfe and Thomas entered the motel room with their weapons drawn. Defendant, Bonapfel, and their two children had been sleeping. The officers took defendant into custody. Officer Parsons asked defendant about the Trans Am. Defendant admitted that the vehicle did not belong to him, but claimed that he had found it in Missouri with the keys inside of it. Officer Parsons then asked defendant whether he had any weapons in the room; responding in the affirmative, defendant directed Officer Parsons to a black fanny pack on the table next to the bed in which defendant had been sleeping. Officers seized a .25 caliber Raven Arms handgun from that fanny pack. The officers had not obtained a warrant to enter defendant's motel room.

While detained in the Geary County jail, defendant attempted to escape. Due to outstanding warrants, however, the Kansas officials transferred defendant to the custody of the FBI in Kentucky without prosecuting him on this charge. Sergeant Beth Gilmer–Jones ("Sergeant Gilmer–Jones") of the Geary County Sheriff's Department forwarded the disposable camera, which she had seized from the stolen Trans Am during a routine inventory, to the FBI in Kentucky. Sergeant Gilmer–Jones prepared a photographic line-up based upon defendant's arrest photograph, and also forwarded this line-up to the FBI. FBI Agent Steven Wight ("Agent Wight") separately presented the photographic line-up to Cochran and Steven Spitznagel ("Spitznagel"), a salesperson who was present when the Trans Am was taken for the test drive. From this photographic line-up, both Cochran and Spitznagel identified defendant as the perpetrator of the car-jacking. In addition to testifying to these out-of-court identifications of defendant, Cochran and Spitznagel also identified defendant as the perpetrator in open court at trial.

## II. Motion for a New Trial

After Bonapfel had testified at trial, defendant learned-via the government's dis-

closure of a prospective government witness' grand jury testimony-that Bonapfel had previously made a statement that contradicted her testimony at trial. On the first day of trial, Bonapfel testified that, on the day of the car-jacking, defendant left her at a gas station in Louisville, Kentucky, and that she next saw defendant with the Trans Am at his mother's house in Bellevue, Kentucky. Early on the second day of trial, the government, believing that it would call FBI Agent Wight as a witness during its case-in-chief, gave defendant a transcript of his grand jury testimony. At the grand jury, Agent Wight testified that Bonapfel had stated that she had seen defendant leave their motel room in Louisville, Kentucky, and that he had returned to that motel room driving the Trans Am. On direct examination, defendant asked Agent Wight whether he had so testified at the grand jury. Answering in the affirmative, Agent Wight explained that this grand jury testimony was based upon what Bonapfel had told another FBI agent; he testified that Bonapfel subsequently told him "a different story" about

where she had seen defendant before and after the car-jacking.

Defendant moved for a mistrial and, subsequently, filed a motion for a new trial on the ground that the government's failure to disclose Bonapfel's statement that she had seen defendant leave a motel and return with the Trans Am ("the 'motel room' statement") before defendant had cross-examined her violated the *Brady* doctrine. In its response to defendant's motion, the government argued that defendant failed to show "a reasonable probability of a different outcome of the trial had the material been available" before the time that the government had disclosed it and, thus, that defendant failed to show that this delayed disclosure was material or prejudiced him. Agreeing with the government, the district court denied defendant's motion for a new trial.

■■■ On appeal, defendant contends that the government's failure to disclose Bonapfel's "motel room" statement to defendant before his cross-examination of her deprived him of his right to effective cross-examination and, thus, a fair trial.[1]

---

1. First, we reject defendant's suggestion that his *Brady* claim hinges upon a theory of total non-disclosure rather than one of delayed disclosure. Defendant argues that the government has never disclosed a "copy" of Bonapfel's "motel room" statement; by this, defendant means a copy of the written account of the FBI's interview of Bonapfel in which she made this statement. In response, the government asserts that it has never given defendant a copy of Bonapfel's "motel room" statement because the only statement that Bonapfel had "adopted and signed" was her statement to Kansas law enforcement. While this assertion may rebut any argument that Bonapfel's "motel room" statement is a "statement" for purposes of the Jencks Act, 18 U.S.C. § 3500, it does not address the possibility that a written account of the FBI's interview of Bonapfel in which she made the "motel room" statement exists for purposes of the *Brady* doctrine. In any event, regardless of whether the government failed to turn

over such a document—assuming it were to exist—, it is clear that the government nevertheless disclosed the substance of Bonapfel's "motel room" statement by virtue of giving defendant a copy of Agent's Wight's grand jury testimony, which relayed that statement. Second, we disregard defendant's suggestions on appeal that the government had a duty to disclose Bonapfel's "motel room" statement before trial so that defendant could investigate and prepare for trial adequately. Materiality for purposes of a *Brady* violation does not pertain "to the defendant's ability to prepare for trial." *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.1994). Lastly, we reject defendant's argument that the delayed disclosure constituted an independent violation of defendant's Sixth Amendment right to effective cross-examination. Defendant was free to cross-examine Bonapfel on any subject. Indeed, defendant cross-examined Bonapfel as to exactly where defendant had "showed up" with the Trans Am. The govern-

In particular, defendant claims that Bonapfel was critical to the government's case because "[s]he was the witness who purportedly linked Stamper to the crime," and that her testimony convicted defendant. According to defendant, his inability to cross-examine Bonapfel about the inconsistent "motel room" statement deprived him of a fair trial because it prevented the jury from witnessing Bonapfel's reaction to such impeachment.

We review the district court's denial of a motion for a new trial for an abuse of discretion. *United States v. Braggs,* 23 F.3d 1047, 1050 (6th Cir.1994) (noting that such a decision is within the district court's sound discretion). Under the *Brady* doctrine, the prosecution must disclose to the defense any evidence that is both favorable to the defendant and "material either to guilt or to punishment." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* doctrine arises from a defendant's right to a fair trial, which the Due Process Clauses of the Fifth and Fourteenth Amendments guarantee. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). This constitutional duty of disclosure attaches regardless of the prosecution's good or bad faith, *Id.,* and regardless of whether the defense requested that evidence-either generally or specifically-or failed to make any request at all, *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (reading *United States v. Bagley,* 473 U.S. 667, 682, 685, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J., and opinion of White, J., concurring in part and concurring in judgment), to reject any such dis-

tinction). Evidence that is favorable to the defendant encompasses impeachment evidence as well as exculpatory evidence. *Bagley,* 473 U.S. at 676.

Evidence that is favorable to the defendant is material only if there is a reasonable probability that, had the prosecution disclosed it to the defense, the result of the trial would have been different. *Kyles,* 514 U.S. at 433. A "reasonable probability" of a different outcome exists "when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* at 434 (citing *Bagley,* 473 U.S. at 678) (internal quotation marks omitted). "The [materiality] question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial"-a trial whose verdict is worthy of confidence. *Id.* The materiality test is not a sufficiency-of-the-evidence test; thus, "[a] defendant need not demonstrate that[,] after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough [evidence] left to convict" him. *Id.* at 434-35. Rather, a defendant must show that the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Generally, the *Brady* doctrine does not apply to a delayed disclosure of evidence that is favorable to the defendant, but only to a total failure to disclose such evidence. *United States v. Bencs,* 28 F.3d 555, 560 (6th Cir.1994). However, a delay in such disclosure constitutes a *Brady* violation "when the delay itself causes prejudice" or

---

ment placed no *direct* restriction on the scope of defendant's cross-examination of Bonapfel; rather, defendant challenges the "[g]overnment's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination." *Bag-*

ley, 473 U.S. at 678. Thus, defendant's alleged constitutional violation arises from his Fifth Amendment right to a fair trial—under the *Brady* doctrine—, not from his Sixth Amendment right to confront his accusers. *See id.*

is material. *Id.* at 561. "[T]he *Brady* doctrine requires only the production of material in time for its effective use at trial." *Id.* The prosecution violates its constitutional duty of disclosure only where its evidentiary "omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Agurs*, 427 U.S. at 108. "For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring the verdict to be set aside; and absent a constitutional violation, there was no breach of the ... [prosecution's] constitutional duty to disclose." *Id.*

We agree with the district court that defendant has failed to demonstrate a reasonable probability that, had the government disclosed Bonapfel's "motel room" statement before Bonapfel's cross-examination, the outcome of the trial would have been different. First, while the government emphasized Bonapfel's eyewitness testimony because of her relationship with the defendant and, thus, her ability to identify him easily, the record belies defendant's contention that only Bonafpel's testimony convicted defendant. Cochran, the victim, testified about the details of the car-jacking and identified defendant as the perpetrator, and Spitznagel identified defendant as having taken the Trans Am for a test-drive with Cochran on the day of the car-jacking.[2] Deputy Thomas testified that the stolen Trans Am was parked directly outside room 55 of the Sunset Motel in Kansas, which was registered in Bonapfel's name, and that defendant was arrested in Kansas. Second, while defendant's cross-examination of Bonapfel about her "motel room" statement could have shown the jury that Bonapfel was lying as to

where she saw defendant before and after the car-jacking, it likely would not have undermined the rest of Bonapfel's incriminating testimony, which an independent witness corroborated. Both Cochran and Bonapfel testified that: 1) defendant had stolen the Trans Am while taking it for a test drive; 2) defendant had handcuffed, gagged, and left the victim-Cochran-on a hill; 3) defendant had referred to the victim as an "old man"; 4) defendant either was or had been in possession of a small caliber handgun, electrical tape, a fanny pack, and a pair of handcuffs; and 5) defendant either was carrying or would carry the handcuffs and the handgun in the fanny pack.

Third, as the district court correctly found, even though defendant was unable to cross-examine Bonapfel about the "motel room" statement, defendant, nevertheless, was able to use that statement effectively at trial. This statement was admitted into evidence via defendant's direct examination of Wight. Moreover, defendant's closing argument-while not evidence-underscored the inconsistency between Bonapfel's "motel room" statement and her trial testimony. In particular, defendant argued that Bonapfel, who, for personal reasons, was falsely incriminating defendant for the car-jacking, had changed her story about having been at a motel on the day of the car-jacking only upon realizing that the police would seek the motel registration as evidence.[3] Lastly, we note that defendant cross-examined Bonapfel about another prior statement that contradicted her testimony at trial and that the jury witnessed Bonapfel's concession that this previous

---

2. As discussed below, we reject defendant's contention that this evidence rests upon "shaky constitutional ground."

3. Defendant also argued that Bonapfel had told the truth when she first informed authorities that defendant had bought the Trans Am from a drug dealer.

statement had been a lie.[4] We also note that, although defendant objected to the government's delayed disclosure of Bonapfel's "motel room" statement as a *Brady* violation during trial, defendant never requested the district court's permission to recall Bonapfel for cross-examination on this statement.[5] In sum, it is not reasonably likely that the trial's outcome would have been different had defendant received the advantage, if any, of cross-examining Bonapfel about the "motel room" statement. The district court did not abuse its discretion in denying defendant's motion for a new trial.

### III. Motions to Suppress Evidence

#### A. Fourth Amendment

Defendant filed numerous pre-trial motions to suppress evidence on Fourth Amendment grounds. Defendant appeals the district court's denial of several of those motions. We review the district court's legal conclusions concerning a suppression motion *de novo. United States v. Smith*, 263 F.3d 571, 581–82 (6th Cir.2001); *see United States v. Leake*, 95 F.3d 409, 416 (6th Cir.1996) (holding that we review *de novo* the mixed questions of whether the inevitable discovery rule or the independent source doctrine applies). We review the district court's factual findings concerning a suppression motion for clear error. *Smith*, 263 F.3d at 581–82; *see United States v. Pollard*, 215 F.3d 643, 648 (6th Cir.2000) (holding that we review the

factual determinations underlying a finding of exigent circumstances for clear error). When considering the denial of a suppression motion, we must view the evidence in the light most favorable to the government. *United States v. Wellman, Jr.*, 185 F.3d 651, 654–55 (6th Cir.1999).

The Fourth Amendment's "exclusionary rule prohibits the introduction into evidence of tangible materials seized during an unlawful search and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). "[T]he exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Id.* at 536–37 (internal quotation marks omitted).

#### 1. Defendant's Arrest Photograph and Identifications of Defendant

■ Defendant filed a motion to suppress his arrest photograph and any identifications of defendant as the perpetrator based upon that photograph on the ground that such evidence was the fruit of defendant's unlawful arrest in his motel room. The district court denied this motion. Although it had previously held that the

---

4. Immediately following defendant's arrest, Kansas law enforcement officials interviewed Bonapfel. In a sworn written statement, Bonapfel stated that defendant had "showed up with a red Trans Am," that she "supposed" defendant had bought it from a drug dealer, and that defendant had told her that it was none of her business how much the car had cost. At trial, Bonapfel testified that defendant had actually told her that he had carjacked the Trans Am, and that she had lied to Kansas authorities at defendant's directive.

5. Defendant claims that he was unable to recall Bonapfel as a witness because he had neither reserved her as a witness for recall nor knew of her location so as to subpoena her. Nevertheless, the district court, in its discretion, could have permitted defendant to recall Bonapfel as a witness and compelled the government, which knew of Bonapfel's location, to make her available for such recall, had defendant made such a request.

warrantless search of defendant's motel room was illegal because exigent circumstances did not exist, the district court held that defendant's arrest in the motel room was lawful. The district court reasoned that defendant had outstanding warrants for his arrest and, even if there had been no such warrants, the officers had probable cause to arrest defendant. Defendant appeals the denial of this suppression motion. To the extent that the district court's ruling suggests that only probable cause to arrest is necessary to render a warrantless arrest in a motel room lawful, such a suggestion is erroneous. In *Payton v. New York,* the Supreme Court held that the Fourth Amendment prohibits law enforcement officers from entering a home-whether to conduct a search or a seizure-absent either a warrant based upon probable cause or exigent circumstances. 445 U.S. 573, 583, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (distinguishing *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), which upheld a warrantless arrest in a *public place* solely on the basis of probable cause). The Supreme Court, in *Welsh v. Wisconsin,* affirmed that this Fourth Amendment protection of the home-known as the *Payton* rule-equally applies to a motel room; in addition, the Court clarified that, per the *Payton* rule, the Fourth Amendment requires that, absent a warrant, both probable cause *and* exigent circumstances exist. 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (involving a warrantless felony arrest in a motel room).

However, we need not determine whether defendant's arrest in his motel room violated the Fourth Amendment. Even assuming, *arguendo,* the unlawfulness of defendant's arrest, the exclusionary rule does not require the suppression of defendant's arrest photograph and any identifications of defendant based upon that photograph. *See United States Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL–CIO,* 330 F.3d 747, 750 (6th Cir.2003) ("We may affirm a decision of the district court if correct for any reason, including one not considered below."). In *New York v. Harris,* 495 U.S. 14, 21, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), the Supreme Court held that, "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the ... [government's] use of a statement made by the defendant outside of his home, even though the statement ... [was] taken after an arrest made in the home in violation of *Payton.*" The Court reasoned that:

> [T]he rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects ... protection where the police have probable cause to arrest the suspect for committing a crime.... Nothing in the reasoning of that case suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house. There could be no valid claim here that ... [the defendant] was immune from prosecution because his person was the fruit of an illegal arrest.... Nor is there any claim that the warrantless arrest required the police to release ... [the defendant] or that ... [the defendant] could not be immediately rearrested if momentarily released.... For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested ... [the defendant] on his doorstep, illegally entered his home to search for evidence, and later interrogated ... [the defendant] at the station house.

*Id.* at 17–18. Thus, the Court held that, where a violation of the *Payton* rule exists,

the exclusionary rule requires the suppression of only that incriminating evidence which is the fruit of the fact that the arrest occurred in the home, rather than in a public place. *Id.* at 20.

While *Harris* is somewhat factually distinguishable from the present case, its legal analysis is directly on-point. Following *Harris*, because the officers had probable cause to arrest defendant,[6] the exclusionary rule does not require the suppression of the photograph of defendant taken at the police station, even if that photograph was taken after defendant's arrest in his motel room in violation of *Payton*. *See United States v. Villa–Velzaquez*, 282 F.3d 553, (8th Cir.2002) (applying *Harris* to police officer's discovery of identity information); *United States v. Banister*, 956 F.2d 1168, 1992 WL 46695, at *1 (9th Cir.1992) (unpublished opinion) (applying *Harris* to police officers' discovery of incriminating evidence on defendant's person). Because the existence of probable cause to arrest defendant justified his continued custody following his removal from the motel room, defendant was in lawful custody at the time that his arrest photograph was taken at the police station. Thus, defendant's arrest photograph was neither the product of being in illegal custody nor the fruit of having been arrested in his motel room, rather than in a public place. *See id.* at 19. Because the exclusionary rule would not require the suppression of defendant's arrest photograph, it would likewise not require the suppression of any out-of-court identifications of defendant based upon that photograph or any in-court testimony concerning such out-of-court identifications, as defendant contends. Thus, we affirm the district court's denial of defendant's motion to suppress his arrest photograph and any identifications based upon that photograph.

### 2. Disposable Camera's Photographs

■ Defendant moved to suppress the incriminating photographs that the government developed from the disposable camera seized from the stolen Trans Am on the ground that they are fruits of the unlawful search of his motel room. The district court denied this motion. In particular, it found that defendant lacked a protected privacy interest in that disposable camera. Additionally, the district court found that Bonapfel owned the camera and had consented to the development of the photographs. Defendant appeals the district court's denial of this suppression motion.

The Supreme Court has "abandoned a separate inquiry into a defendant's 'standing' to contest an allegedly illegal search in favor of an inquiry that focuse[s] directly on the substance of the defendant's claim that he or she possessed a 'legitimate expectation of privacy' in the area searched." *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (relying upon *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)); *see United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (defining a "search" for purposes of the Fourth Amendment as a government infringement upon "an expectation of privacy

---

**6.** Defendant does not dispute that the officers had probable cause to arrest him based upon both the NCIC dispatch that the Trans Am was stolen and had been used in an armed robbery and the vehicle's connection to the room in which defendant was staying. Thus, absent an arrest warrant, the lawfulness of defendant's arrest in his motel room hinges upon the existence of exigent circumstances. We express no opinion on whether the outstanding warrants for defendant's arrest on unrelated charges satisfy the Fourth Amendment's warrant requirement for this arrest of defendant.

that society is prepared to consider reasonable"). Defendant has no legitimate expectation of privacy in the stolen Trans Am or its contents, including the disposable camera and its film. *United States v. Hensel,* 672 F.2d 578 (6th Cir.1982) (holding that, because "the defendant had no legitimate expectation of privacy in the stolen truck or its contents," he, thus, "had no standing to challenge the search of the truck"); *see Rakas,* 439 U.S. at 141 n. 9, 143 n. 12 (affirming that a defendant has no capacity to challenge an allegedly unlawful search of premises where the defendant's presence on those premises was unlawful and illustrating this principle with a defendant's presence in a stolen vehicle). Even if defendant owned the disposable camera, as he claims,[7] such ownership would not afford defendant an expectation of privacy that society would recognize as legitimate. *See Rakas,* 439 U.S. at 149 n. 17 (affirming that "arcane distinctions ... [of] property law ought not to control") (internal quotation marks omitted); *Rawlings,* 448 U.S. at 104–06 (holding that, even though the defendant owned items in his companion's purse, he had no capacity to challenge an allegedly unlawful search of that purse because he had no legitimate expectation of privacy in the area searched).

Defendant claims that, even if the government were in lawful possession of the Trans Am and the disposable camera, it nevertheless was required to obtain a warrant to develop that camera's film under *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). In *Walter,* the Supreme Court held that, although the government was in lawful possession of several boxes of film, the government's unauthorized projection of that film was an unreasonable search in violation of the defendant owners' legitimate expectation of privacy in the film. *Id.* at 654, 658. Thus, in *Walter,* the Supreme Court's finding that the projection of the film was an unreasonable search in violation of the Fourth Amendment was contingent upon its finding that the defendant owners had a constitutionally-protected interest in that film. Here, however, defendant has no legitimate expectation of privacy in the disposable camera's film; thus, his challenge to the development of that film as an unlawful search must fail.

### 3. Bonapfel's Testimony

■ Defendant moved to suppress any statement or testimony by Bonapfel on the ground that they are the fruit of either an unlawful arrest of defendant in his motel room, in which Bonapfel was present, or an unlawful search of that motel room. The district court denied this motion. Specifically, the court held that, because the registration for room 55 listed Bonapfel's name and home address, the officers' discovery of Bonapfel's identity—whether before or after the illegal search—came from a source independent of any illegality. Defendant appeals the district court's denial of this suppression motion.

However, we agree with the district court that the exclusionary rule does not require the suppression of any of Bonapfel's statements or testimony.[8] In affirming the district court's denial of this suppression motion, our analysis is not limited to the independent source doctrine, but

---

7. Defendant relies upon Bonapfel's testimony at trial that defendant, as Bonapfel's financial provider, had bought the camera.

8. In so holding, we need not and do not express any opinion upon whether the search of defendant's motel room or his arrest in that motel room violated the Fourth Amendment; rather, our analysis assumes *arguendo* the unlawfulness of that search and seizure.

may rely upon any applicable exception to the exclusionary rule. *See Nat'l Ass'n of Letter Carriers, AFL–CIO,* 330 F.3d at 750. "[T]he fruit-of-the poisonous-tree doctrine is subject to [the following three] qualifications: (1) the independent source doctrine; (2) the inevitable discovery rule; and (3) the attenuated connection principle." Joshua Dressler, Understanding Criminal Procedure § 21.08 (2d ed.1997). The independent source doctrine and the inevitable discovery rule are relevant to our analysis here.[9]

As the record demonstrates, the registration card for room 55 lists Bonapfel's name and home address. Deputy Thomas read this registration card, which he obtained from the motel manager. Defendant claims that Deputy Thomas learned of Bonapfel's name and address from the registration card only *after* he had entered defendant's motel room. The district court held that the independent source doctrine applies regardless of when Deputy Thomas learned of Bonapfel's name and address from the registration card and, thus, made no factual finding as to whether Deputy Thomas acquired this knowledge before or after he had entered defendant's motel room. This proposition, however, over-simplifies the doctrine. The independent source doctrine applies where the government proves that it, in fact, has acquired "knowledge or possession of evidence" from a source "wholly independent of any constitutional violation." *United States v. Dice,* 200 F.3d 978, 984 (6th Cir.2000) (internal quotation marks omitted). In *Murray v.*

*United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), the Supreme Court held that the independent source doctrine applies both to "evidence obtained for the first time during an independent lawful search" and "to evidence initially discovered during, or as a consequence of an unlawful search, but later obtained independently from activities untainted by the initial illegality." Thus, the independent source doctrine would apply if Deputy Thomas had learned of Bonapfel's name and address from the registration card *before* he entered defendant's motel room as such identity evidence first would have been obtained regardless of any illegality. *See id.* However, the applicability of the independent source doctrine would be less clear if Deputy Thomas learned of Bonapfel's name and address from the registration card after he had entered the motel room. In such a situation, the independent source doctrine may still apply, but it would only apply if Deputy Thomas' acquisition of this knowledge was neither dependent upon nor tainted by any prior illegality. In other words, where an officer initially discovers evidence from an unlawful source but subsequently obtains that evidence from a different source, the applicability of the independent source doctrine turns upon the circumstances surrounding and the motivation behind the officer's subsequent obtainment of that evidence. Such an inquiry is necessary to establish that the subsequent acquisition of the challenged evidence was, indeed, independent of any illegali-

---

**9.** Defendant principally relies upon *United States v. Ceccolini,* 435 U.S. 268, 273–80, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), which modified the "attenuated connection principle" as it applies to challenges to live-witness testimony, and held that "the degree of free will" that the witness exercises is a relevant factor in the attenuation analysis. Because we find that the inevitable discovery doctrine applies so as to exempt Bonapfel's testimony from the exclusionary rule, we need not address whether the attenuated connection principle affords an additional basis for such exemption.

ty and, thus, from a lawful source. Here, in admitting Bonapfel's testimony under the independent source doctrine, the district court neither made a finding as to when Deputy Thomas learned of Bonapfel's name and address from the registration card nor made any inquiry into the circumstances or motivation behind Deputy Thomas' perusal of the registration card, in case he had done so after entering the motel room. The record is ambiguous as to when Deputy Thomas read Bonapfel's name and address from the registration card and is silent as to what prompted Deputy Thomas to obtain that information. While it is possible that Deputy Thomas read the registration card pursuant to routine investigative procedure, it is equally possible that he read it to determine if the name listed on it matched one of the names by which defendant and Bonafpel identified themselves after the officers' entry into the motel room—whether for corroboration purposes or for investigation into the possible use of an alias. As Deputy Thomas testified, after the officers arrested defendant in the motel room, he gave them his name and date of birth, and the officers subsequently ran another NCIC check on this information. We cannot say that the record sufficiently supports the applicability of the independent source doctrine. However, we need not remand the case to the district court to correct these evidentiary omissions. *See id.* at 542 (remanding for a determination of whether the agents' subsequent decision to search pursuant to a warrant was independent and untainted by knowledge that they gained from the prior illegal entry). Even assuming that Deputy Thomas read the registration card only after he had entered the motel room based upon identity information that he had gained

from that entry, the record sufficiently establishes the applicability of the inevitable discovery rule.

The inevitable discovery rule applies where the government establishes "that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 443–444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (setting out the quantum of proof as a preponderance of the evidence). For the inevitable discovery rule to apply, the government must demonstrate *"either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Keszthelyi,* 308 F.3d 557, 574 (6th Cir.2002) (internal quotation marks omitted) (applying *Murray* to the inevitable discovery rule). "The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *Id.* (internal quotation marks omitted). Although the application of the doctrine requires some speculation about how events would have transpired absent any illegality, "we must keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment." *Id.* (internal quotation marks omitted); *see Leake,* 95 F.3d at 412 (holding that, in determining what would have happened had the unlawful search or seizure never occurred, we consider the factual circumstances as they existed immediately before that illegal search or seizure).

The record sufficiently demonstrates that Deputy Thomas would have discovered Bonapfel's name and address from the room registration card, even if he had not

entered defendant's motel room. Bonapfel testified that she and defendant did not stay at any motel for very long because of the outstanding warrants for defendant's arrest. Thus, had the officers not entered the motel room, defendant and Bonapfel would have left the motel room within a short period of time. Because they had probable cause to arrest defendant, the officers would have arrested defendant as soon as he left the motel room. *See Watson*, 423 U.S. at 411. Upon being arrested, defendant would have given the officers his name and birth date, as he had done when they arrested him in the motel room. Thus, assuming that Deputy Thomas read the motel registration card to verify previously-obtained identity information, he would have done so even if he had not entered the motel room.

Defendant argues that the government was also required to prove that, absent any illegality, it obtained or would have obtained Bonapfel's cooperation with law enforcement and her testimony at trial. Bonapfel testified that she was testifying, not of her own free will, but because she was under a subpoena. As discussed above, the government would have obtained Bonapfel's name and home address from the motel registration card regardless of any illegality. Because this knowledge was all that the government needed to execute a subpoena to compel Bonapfel's testimony, the government would have obtained this testimony regardless of any illegality. Since we find that the record sufficiently demonstrates that the government would have obtained Bonapfel's testimony regardless of any illegal search or seizure, per the inevitable discovery rule, we affirm the district court's denial of defendant's motion to suppress such testimony.

### B. Due Process Clause

■ Defendant filed a motion to suppress evidence of or testimony pertaining to Cochran and Spitznagel's identifications of defendant as the perpetrator on the ground that the photographic line-up from which they first identified defendant as well as the techniques that law enforcement employed in presenting that line-up were unconstitutionally suggestive. After holding an evidentiary hearing on the matter, the district court denied this motion. In particular, the court found that the photographic-line up and its accompanying procedures were neither impermissibly suggestive nor created a substantial risk of misidentification. Defendant appeals the denial of this motion.

Where a defendant challenges his conviction based upon an eyewitness identification at trial following a pre-trial photographic identification, the Due Process Clause requires that the conviction be set aside "only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (defining this standard as a fact-specific, totality-of-the-circumstances test); *see Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (holding that it is this "likelihood of misidentification which violates a defendant's right to due process of law"). In assessing the merits of this claim, we conduct a two-step analysis. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir.1994). We first determine whether the defendant has proved that the pre-trial identification procedure was unduly suggestive. *Id.* at 1070–71. We consider several factors, such as "the size of the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves." *United States v. Sanchez*, 24 F.3d 1259 (10th Cir.1994). In *United States v. San-*

*chez*, 24 F.3d at 1262–63, the Tenth Circuit aptly noted that:

> [T]he number of photographs in an array is not itself a substantive factor, but instead is a factor that merely affects the *weight* given to other alleged ... irregularities in an array. The larger the number of pictures used in an array, the less likely it is that a minor difference ... will have a prejudicial effect on selection ... [because] the differences become diluted and less obvious among the large number of images, each of which are [sic] likely to contain some sort of minor idiosyncratic aberration.... Conversely, when a relatively low number of photographs are [sic] used in an array, minor differences ... can make a picture stand out.... Upon continued inspection, the witness may begin to believe that the "oddball" picture was taken under different circumstances than the others, [and] ... can suggest ... that the similar pictures were taken together to form a pool or control group, and that the one picture that stands out is the suspect.

As to the presentation of a photographic line-up, the Supreme Court recognized in *Simmons v. United States,* 390 U.S. at 383, that the risk of misidentification increases where: 1) "the police display to the witness only the picture of a single individual who generally resembles the person he saw"; 2) the police show the witness "the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized"; or 3) "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."

If the defendant demonstrates that the identification procedure was unduly suggestive, we then determine whether that procedure was nevertheless reliable under the totality of the circumstances. *Ledbetter,* 35 F.3d at 1071. In assessing the reliability of the identification procedure, we consider such factors as: (1) the witness' opportunity to observe the criminal at the time of the crime; (2) the witness' degree of attention at the time of this observation; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty that the witness demonstrated when confronting the defendant; and (5) the length of time between the crime and the confrontation. *Id.*

Defendant contends that the photographic line-up from which both Cochran and Spitznagel identified defendant as the perpetrator was unduly suggestive. Agent Wight asked the Geary County Sheriff's Department to prepare a photographic line-up of defendant because it had taken defendant's arrest photograph and would likely have similar arrest photographs since they vary among departments. In selecting comparison photographs for the line-up, Officer Gilmer–Jones first ran a search in her department's database of arrest photographs for individuals matching defendant in such general characteristics as height, weight, and hair color; from that pool, she selected five individuals with additional attributes similar to defendant's, such as his general mouth and chin shape, a large forehead, and receding hairline. However, defendant's arrest photograph had been taken with a newer digital camera while the other arrest photographs in the department's database had been taken with a prior digital camera, which had broken. Due to the difference in cameras, the colors of defendant's jumpsuit and that of the background appeared differently than those in the other photographs; Officer Gilmer–Jones changed all of the photographs to black-and-white to neutralize these color differences.

Defendant argues that defendant's photograph was different from the other five photographs in that it had a different clarity, defendant's face was farther away from the camera, and only defendant had a "five o'clock shadow type of mustache." Relying upon *Sanchez,* 24 F.3d at 1262–63, defendant argues that, due to the small size of the array, these differences made defendant's photograph stand out such that Cochran and Spitznagel likely thought that the other photographs were merely a control group for defendant's photograph. However, it is clear that the photographic line-up is not, in itself, unduly suggestive. While defendant's face is much farther away from the camera than those of three of the men, it is only slightly farther away from the camera than those of two of the men. While defendant's face appears to have slight facial hair on both his upper lip and his chin, at least one other man's face appears to have this same facial hair. Although all of the photographs have small dots on them due to the use of digital cameras, defendant's photograph has a bit more clarity. However, it is unlikely that this difference in clarity would "lead the eye of the unguided viewer" to defendant's photograph, given that all of the men pictured had dark hair, receding hairlines, large foreheads, and down-turned mouths like defendant and four of the men had pronounced chins like the defendant. *Sanchez,* 24 F.3d at 1263 (holding that a six-photograph array in which defendant was the only individual with his eyes closed and only one of two individuals not staring directly into the camera was not unduly suggestive even though the robber was wearing dark sunglasses); *see Grubbs*

*v. Hannigan,* 982 F.2d 1483, 1490 (10th Cir.1993) (noting that a photograph line-up is "not necessarily suggestive merely because the individuals ... differ in facial characteristics," but suggesting that such differences are suggestive where they are striking or relate to an important characteristic of the victim's description).

Defendant also contends that the techniques that law enforcement employed in presenting the photographic line-up to Cochran and Spitznagel were unconstitutionally suggestive. Defendant argues that Spitznagel had learned from someone at the dealership that the FBI had a suspect in custody before Agent Wight presented the photographic line-up to him. At the suppression hearing, Spitznagel testified that, before the photographic line-up, he had learned from someone at the dealership that the FBI had arrested someone out west. However, Spitznagel also testified that Agent Wight, in presenting the photographic line-up, had never suggested which photograph he should choose.[10]

Because Agent Wight presented the same photographic line-up[11] to Cochran two days after he had presented it to Spitznagel, there is some risk that Spitznagel shared with Cochran knowledge about the identification process or that the FBI had a suspect in custody. However, at the suppression hearing, Spitznagel testified that Agent Wight had never suggested whether Spitznagel had chosen the correct individual. In any event, according to Spitznagel, Agent Wight had instructed him not to discuss the photographic line-up with anyone, including Cochran. Spitznagel also testified that, after he had viewed

---

10. We note that, at trial, Spitznagel testified that, before he had identified defendant from the photographic line-up, he had no idea if the line-up included the perpetrator's photograph. We further note that Spitznagel also testified that he did not recall whether he had

learned that someone had been arrested in Kansas before the photographic line-up.

11. The photographs in the line-up were stationary such that Agent Wight was unable to change their order.

the photographic line-up, he had never spoken with Cochran about the photographic line-up, in particular, or the carjacking, in general.[12] Moreover, Cochran testified that, at the time of the photographic line-up, he had not known whether Spitznagel had even viewed the photographic line-up.

Defendant contends that, after Cochran had identified defendant from the photographic line-up, Agent Wight had informed Cochran that a suspect was in custody and suggested to Cochran, contrary to his normal practice, that Cochran had chosen the correct photograph. Both Agent Wight's and Cochran's testimony support this contention. It was certainly improper for Agent Wight to have conveyed this information to Cochran. However, because Cochran acquired this information only *after* he had identified defendant from the photographic line-up, it could not have rendered this photographic identification unduly suggestive. Defendant does not argue—nor does the record adequately demonstrate—that Cochran had this information before he viewed the photographic line-up. In fact, at the suppression hearing, Cochran testified that Agent Wight had never suggested which photograph Cochran should choose from the photographic line-up.[13]

The district court did not err in finding that defendant has failed to establish that the photographic line-up from which both Cochran and Spitznagel identified defendant as well as the techniques that Agent Wight employed in presenting that line-up were unconstitutionally suggestive. Be-

cause the first step of the requisite analysis ends in the government's favor, we need not address whether, under the totality of the circumstances, the photographic identifications were nevertheless reliable. *See Ledbetter*, 35 F.3d at 1071. We also need not address defendant's derivative claim that the alleged unconstitutionally-suggestive nature of these photographic identifications tainted Cochran's and Spitznagel's in-court identifications of defendant.

## IV. Sentencing Issues

Defendant appeals the district court's applications of sentence enhancements for "obstructing or impeding the administration of justice" and for "serious bodily injury" under United States Sentencing Guidelines ("U.S.S.G.") § 3C1.1 and § 2B3.1(b)(3)(B), respectively.[14] We review a district court's factual determinations underlying an application of a sentencing guideline for clear error. *United States v. Jackson–Randolph*, 282 F.3d 369, 390 (6th Cir.2002). We review a district court's application of a sentence enhancement for obstruction of justice under § 3C1.1 for clear error. *Id.* at 389–90; *see Buford v. United States*, 532 U.S. 59, 66, 121 S.Ct. 1276, 149 L.Ed.2d 197 (2001) (holding that "[i]n light of the fact-bound nature of the legal decision, the comparatively greater expertise of the [d]istrict [c]ourt, and the limited value of uniform court of appeals precedent, a district court's decision as to whether an alleged career offender's prior convictions were functionally consolidated for sentencing under U.S.S.G. § 4B1.2 receives deferen-

---

12. Indeed, Spitznagel testified at trial that, at that time, he still did not know whether he and Cochran had even identified the same person.

13. Additionally, we note that Cochran testified at trial that Agent Wight, in presenting

the photographic line-up, had never suggested that it contained a suspect.

14. Sentencing calculations relied upon the 2001 edition of the United States Sentencing Guidelines.

tial review"). Likewise, we review a district court's application of a sentence enhancement under U.S.S.G. § 2B3.1(b)(3) for clear error. *See Buford,* 532 U.S. at 66; *United States v. Adu,* 82 F.3d 119, 124 (6th Cir.1996) (holding that we review the interpretation of a sentencing guideline *de novo* and "a court's factual determination of whether a ... guideline applies in a particular case under a clearly erroneous standard").

## A. Obstruction of Justice

■ After finding that defendant had attempted to escape from custody before trial, the district court applied a two-point enhancement to defendant's base offense level under U.S.S.G. § 3C1.1. *See* USSG § 3C1.1, comment. (n.4(e)) (listing "attempting to escape from custody before trial" as an example of the conduct to which this enhancement applies). Defendant challenges the application of this enhancement on the sole ground that the government has failed to demonstrate that defendant had, in fact, attempted to escape. While defendant was detained at the Geary County jail in Kansas following his arrest for the car-jacking, officers discovered that defendant had chipped away at portions of his cell wall and had broken a plexi-glass window so as to gain access to a plumbing closet, which leads to the jail's main hallway; in that closet, defendant had broken several light bulbs and dismantled the plumbing. Officers subsequently found two nails and a bobby pin under defendant's control. Based upon this incident, a Kansas Offense Report cited defendant for an attempted escape from custody as well as criminal damage to property. However, because of defendant's "imminent transfer to Kentucky on [f]ederal and [s]tate charges," Geary County officials did not press charges against defendant.

The district court held that the government had sufficiently demonstrated that defendant had attempted to escape while in pre-trial custody; in doing so, it underscored that the Kansas officials, in issuing defendant a citation, had denominated the event an escape attempt in their citation of defendant. However, the district court called it a "very close question" because the reported facts are ambiguous and Kansas authorities had never tried to prosecute defendant on or administratively discipline him for the escape attempt. On appeal, defendant cursorily asserts that "there is little basis for any inference that ... [he] was planning an escape through the pipes." We disagree. One may reasonably infer that defendant was seeking a way out of his cell, thereby attempting to escape custody, when he forced his way into a plumbing closet behind his cell with the aid of a bobby pin and some nails and dismantled some of the plumbing. Such an inference is certainly more plausible than that defendant accessed the plumbing closet only with the intent to explore the jail's plumbing system—whether out of sheer boredom or an unusual fascination with pipes—; to investigate the plumbing system to ensure proper sanitation; or to sabotage the plumbing system in retaliation for his incarceration. The district court did not clearly err in applying a two-point enhancement for attempted obstruction of justice under U.S.S.G. § 3C1.1.

## B. Serious Bodily Injury

■ U.S.S.G. § 2B3.1(b)(3) provides: "[i]f any victim sustained bodily injury, increase the offense level according to the seriousness of the injury." A victim sustaining only the prerequisite "bodily injury" dictates a two-level enhancement. U.S.S.G. § 2B3.1(b)(3)(A). The term *bodily injury* denotes "any significant injury," such as "an injury that is painful and obvious, or is of a type for which medical

attention ordinarily would be sought". USSG § 1B1.1, comment. (n.1(b)). A victim sustaining a "serious bodily injury" compels a four-level enhancement. U.S.S.G. § 2B3.1(b)(3)(B). The term *serious bodily injury* denotes "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." USSG § 1B1.1, comment. (n.1(i)).

At the suppression hearing, defendant argued that Cochran had neither sustained the requisite "bodily injury" nor a "serious bodily injury." In support, defendant relied upon a medical record from Bullitt County EMS, which stated that Cochran "had a small scratch on [his] arm from a tree or thorn bush"; that he "had a small amount of blood on [his] arm"; and that he "did not want EMS and stated that he was fine." The government sought a six-point enhancement under U.S.S.G. § 2B3.1(b)(3)(C) on the ground that Cochran had sustained a "permanent or life-threatening bodily injury." Specifically, the government argued that Cochran has "permanent scars" on his wrists from where defendant had placed tight handcuffs on him, and that, on the evening of the car-jacking and due the stress of that event, Cochran suffered a heart attack and had gone to the hospital. The district court found that Cochran had sustained a "serious bodily injury" and, thus, applied a four-point enhancement under § 2B3.1(b)(3)(B). In so finding, the court relied upon the permanent scars on Cochran's wrists as well as his "medical condition, including his trip to the hospital later that evening."

The district court did not clearly err in finding that Cochran had sustained the prerequisite "bodily injury" so as to trigger the applicability of § 2B3.1(b)(3) to defendant's sentence. Deputy McGaha testified that Cochran's handcuffs were tight and that his "wrists were bleeding from where the handcuffs had been." Deputy McGaha also testified that Cochran had cuts on his upper arm and that these cuts came from both defendant kicking him and scratches from some briars or bushes. The government admitted into evidence photographs capturing these injuries; such photographs also reveal the "painful and obvious" nature of Cochran's injuries. USSG § 1B1.1, comment. (n.1(b)). Cochran testified that, because he "was all bloody," EMS had offered to clean up his wounds, but he had declined their offer, stating that he was "all right." However, Deputy McGaha clarified that EMS had "check[ed]" Cochran on the scene. Thus, Cochran injuries were also "of a type for which medical attention *ordinarily* would be sought." USSG § 1B1.1, comment. (n.1(b)) (emphasis added). That EMS was called to the scene and, once there, offered to cleanse Cochran's wounds evidences this factor and overshadows Cochran's refusal of such treatment. Thus, the district court did not clearly err in finding that defendant had inflicted a "bodily injury" upon Cochran so as to warrant at least a two-point enhancement to his sentence under § 2B3.1(b)(3)(A).

▆ The district court, however, did clearly err in finding that Cochran had sustained a "serious bodily injury" so as to trigger a four-point enhancement to defendant's sentence under § 2B3.1(b)(3)(B). The cuts on Cochran's wrists or upper arm from the tight handcuffs or defendant's kick, respectively, did not constitute injuries "involving the protracted impairment of a function of a bodily member"—his hands or arms, respectively. USSG § 1B1.1, comment. (n.1(i)). Cochran's wounds to his wrists and arm also did not

necessitate "medical intervention such as surgery, hospitalization, or physical rehabilitation." *Id.* Consequently, the only way that Cochran's wounds could have constituted a serious bodily injury is if they had caused him "extreme physical pain."[15] *Id.* While the tight handcuffs might have caused Cochran significant physical pain as he was struggling to unbind his ankles, there is no basis in the record to characterize this pain as "extreme."

In finding that Cochran sustained a "serious bodily injury," the district court also relied upon Cochran's "medical condition" and his related trip to the hospital. The record demonstrates that Cochran suffered from hypertension; that Cochran, on the evening of the car-jacking, went to the hospital after he "started getting dizzy"; and that his blood pressure read 180/120 at the hospital. However, the record is silent as to the duration of Cochran's trip to the hospital, what medical treatment, if any, Cochran received there, or what specific physical symptoms or impairments-besides dizziness-that Cochran experienced from this blood pressure. Thus, there is no evidence that Cochran's elevated blood pressure caused him "extreme physical pain," that it "requir[ed] medical intervention such as surgery, hospitalization, or physical rehabilitation"; or that it involved "the protracted impairment of a function of a bodily member, organ, or mental faculty." USSG § 1B1.1, comment. (n.1(i)). Because the record does not contain the facts necessary to find that Cochran's elevated blood pressure constituted a "serious bodily injury," the district court's application of a

§ 2B3.1(b)(3)(B) sentence enhancement on this ground was also clearly erroneous.

For the preceding reasons, we AFFIRM the judgment of conviction, but REVERSE defendant's sentence and REMAND for further proceedings consistent with this opinion.

---

15. Because Cochran, at the time of the car-jacking, was taking Coumadin, a blood thinner which makes one bleed more easily, for his hypertension, the unusual blood loss from Cochran's wounds likely exaggerated the appearance of their severity, as defendant has argued. Thus, one cannot infer that the wounds caused Cochran great pain based upon their bloodiness.