**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Enrique GODINEZ (96–1441) and Juvenal Godinez (96–1501), Defendants–Appellants.**

**Nos. 96–1441, 96–1501.**

United States Court of Appeals, Sixth Circuit.

Argued May 1, 1997.

Decided June 2, 1997.

Janice Kittel Mann, Asst. U.S. Attorney (argued and briefed), Office of the U.S. Attorney for W.D. of Mich., Grand Rapids, MI, for plaintiff–appellee.

Joseph H. Doele (argued and briefed), Idema & Keyser, Grand Rapids, MI, for defendant–appellant in No. 96–1441.

Donald W. Garthe (argued and briefed), Wyoming, MI, for defendant–appellant in No. 96–1501.

Before: GUY, NELSON, and NORRIS, Circuit Judges.

## OPINION

RALPH B. GUY, Jr., Circuit Judge.

Defendants, Juvenal and Enrique Godinez, were convicted after a jury trial of one count of conspiracy to distribute and possess with intent to distribute marijuana.

On appeal, Juvenal Godinez raises four claims of error: (1) the trial judge made a comment that prejudiced the jury; (2) the trial court erred in denying a motion in limine to exclude evidence of a prior drug conviction; (3) the government improperly elicited testimony indicating a prior conviction, notwithstanding that defendant did not testify; and (4) the trial judge erred in allowing into evidence a statement made by defendant during the booking procedure.

Enrique Godinez raises only sentencing issues on appeal. He claims error in the court's computation of the quantity of drugs for which he was held accountable, and also argues he should not have received a three-level enhancement for being a manager or supervisor.

Our review of the record convinces us that no errors occurred requiring reversal, and

we affirm the convictions and sentences of both defendants.

## I.

Juvenal and Enrique Godinez were part of a large marijuana distribution conspiracy that existed between July of 1988 and August of 1992. Although several persons were indicted, only the Godinezes went to trial. The other indicted co-conspirators entered pleas of guilty and testified against the Godinezes at trial as did certain unindicted coconspirators. In essence, the conspiracy involved obtaining large quantities of marijuana in Mexico, transporting the marijuana through Texas to California, and from California to Michigan. If the testimony of the co-conspirators is to be believed, and it is obvious that the jury did believe the testimony, the evidence against Juvenal Godinez can only be described as overwhelming. The evidence against Enrique Godinez was not as formidable. However, he raises no issues as to his conviction on appeal. Since the sufficiency of the evidence to convict is not at issue in this case, no detailed statement of the background facts is necessary.

## II.

We address first the claimed errors raised by Juvenal Godinez. He claims that he was prejudiced by a comment made by the trial judge near the completion of the government's case. Prior to the comment being made, the government had called 15 witnesses and the trial judge thought that the testimony was becoming cumulative. At the conclusion of the cross-examination of the fifteenth witness, as the government was about to conduct redirect examination, the trial judge stated:

I might refer the parties to Rule 403, which says, in part, "Although relevant, the Court may exclude evidence even if probative for considerations of undue delay, waste of time or needless presentation of cumulative evidence." So I think the parties should focus on what the issues are and where we are. Some of this information is nice to know, but it's not focused. And we don't have an infinite amount of time to try this case. And some judges

will put time limits. I haven't done that. So I would ask the parties to bear in mind that it might be nice to know everything there is to know, but that's not the purpose of a trial. The question is whether or not these defendants are guilty of this crime. So this business about his background and this, that and the other and so forth, that might be nice to know for the jury, but I think the court has a pretty good idea of what happened here. Maybe the jury does, too, at this point. So I'd just ask the parties to keep that in mind.

Later that same day, the court also stated to the jury:

I might explain to the jury the question of cumulative evidence so that they'll understand what the Court is talking about. If ten people see a person run a red light, the question is whether you call ten people to say that or five, so that's the concept that we're trying to get over here.

After the trial judge made his initial comment, defense counsel moved for a mistrial. The motion was denied. The court did elect to give a curative instruction, however, and when the jury next convened two days later, the court stated:

I want to give you an instruction or some comments regarding some comments that the Court made last week regarding this case. The Court was in the process of urging the government to speed up its case. Whenever we talk about cumulative evidence, that's a code word to the lawyers that they should speed their case up. And I was talking about the fact that some of the evidence was cumulative and questioning whether or not the government needs to call a witness or pursue a line of inquiry because the government has gone into that already a number of times.

In attempting to get the government to speed up its case—in my view, it was repetitious—the Court made this comment: "The Court knows what has happened in this case, and the jury knows what has happened in this case." This was, of course, meant to convey—and this is what the court meant to convey—that the Court knows what's happened in this

case from the government's point of view, from the government's theory of the case. I did not intend to convey that the government has proved its case. I merely was commenting that I thought that the government was offering cumulative or repetitious testimony.

It will be up to you to decide, based on the evidence and the instructions of the Court, whether the government has proved its case. It will be up to you to decide, not me, whether these defendants are guilty or not guilty. I have absolutely no opinion as to the guilt or innocence of these defendants or whether these defendants should be found guilty or not guilty. I have absolutely no opinion in that regard.

Therefore, if you construed my comments regarding cumulative evidence as expressing an opinion about the believability of this evidence one way or the other, then that was not the proper conclusion to draw from the comments. I repeat, I have expressed no opinion about this case or the government's evidence. This will be up to you to decide.

It is defendant's interpretation of the judge's comments that he was in effect telling the jury "I've heard enough and I assume you have too—these defendants are guilty." We reject this interpretation. It is clear that given the point in time in the trial when this comment was made, it was the intention of the trial judge to remind counsel, principally the counsel for the government, that there was no need to needlessly introduce cumulative testimony. Although in our view such comments are better made outside the presence of the jury, we find no prejudice resulting from these comments that would require a reversal. This is particularly true in light of the fact that the evidence against Juvenal Godinez was very substantial.

### III.

Juvenal Godinez had a 1986 drug conviction involving heroin. Prior to trial, defense counsel made a motion in limine to exclude any reference to this conviction in the event that the defendant elected to testify. The trial judge denied the motion, and Juvenal Godinez did not testify during the trial.

Defendant now argues that in denying the motion the trial judge neglected to go through the balancing analysis required by Federal Rule of Evidence 609(a), in which the court is required to balance the prejudicial effect of the proffered evidence against its probative value. Although the trial judge made a finding that the conviction was less than 10 years old as is required, and also found that the evidence relative to the conviction would be "relevant," he did not affirmatively indicate on the record his findings as to the possible prejudicial effect flowing from introducing the conviction into evidence versus its probative value.

■ There is no doubt that proper procedure would have required the trial judge to indicate on the record his conclusions as to the prejudicial versus probative effect of the prior conviction. However, since defendant did not testify, the ruling by the trial judge concerning the admissibility of the prior conviction is not an appealable issue. *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984); *United States v. Sanderson,* 966 F.2d 184, 189 (6th Cir.1992). In *Sanderson,* the trial court denied a defendant's motion in limine to bar the use of a previous drug conviction for impeachment purposes. After the motion was denied, the defendant did not testify. On appeal, the defendant argued that the trial court abused its discretion by denying the motion without making any finding that the probative value of the prior conviction outweighed its prejudicial effect. On appeal, we rejected this argument, finding that the defendant lost his right to appeal by not testifying. Defendant does not challenge this binding precedent, and, in fact, in his reply brief admits that the government has relied on the controlling principle of law. Accordingly, we have no issue to review regarding the court's denial of the motion in limine relative to the prior conviction.

### IV.

Defendant Juvenal Godinez next argues that, although he did not testify, the government nonetheless improperly elicited testimony indicating that he had a prior drug

conviction. To understand this issue, some additional background is necessary. Although Juvenal did not testify, nor did he offer any witnesses on his behalf, his brother and co-defendant, Enrique Godinez, testified as well as offering additional witnesses. It was the thrust of Enrique's testimony and that offered by the witnesses called on his behalf, that he was not involved in his brother's marijuana business, and that his brother was solely responsible for the activities relating to the marijuana conspiracy.

In an effort to distance Enrique from Juvenal Godinez, Enrique Godinez's attorney asked the following questions of Maria Godinez, Enrique's wife, while she was testifying:

Q   Do you know Enrique's brother, Tooley? [1]

A Yes, I do.

Q   Is he seated in the courtroom today?

A Yes, he is.

Q   Can you please tell me what he's wearing?

A   A black and red sweater—I mean the shirt is black and red.

Q   How close is your husband to Tooley?

A   Not close—really, close, you know. There's an age gap, you know. He's the oldest, and he's probably in the middle, so there wasn't really nothing in common. They're not that close.

Q   Was there something that happened that you and your husband decided that there was no reason to have any contact with Tooley?

A Well, in the past, you now, we heard that he was—he had been caught in Seattle, and to us he's like a bad apple for the family. And we just didn't—that's the reason we didn't communicate or didn't want nothing to be with him—do anything with him.

Later in the testimony, Enrique Godinez's attorney asked Maria about Enrique's brother, Juan Godinez:

Q   Was there another brother that you also decided not to have much contact with?

A With Juan.

Q   Juan, is it?

A Um-hum.

Q   And what was the reason for that?

A Because of the same reason with Juvenal, you know, bad apple.

No objection was made to this line of questioning by either the government or defendant Juvenal Godinez.

This testimony became significant to the government because it was Enrique Godinez's testimony that he had come to Michigan not to deliver drugs, but at the request of his mother to look for his brother, Juan. On cross-examination, the government attempted to show the unlikelihood that the defendant would come to Michigan to look for his "bad apple" brother Juan. To that end, the government attorney elicited the following testimony:

Q   Well, first of all, he's going to find someone you said you don't want anything to deal with, Juan; right? He's a bad apple, right?

A Yes.

Q   Why is he a bad apple?

A Well, his previous past.

Q   Well, what's his previous—what's Juan's previous past?

A Well, his history. We know that they were in Seattle for—probably for drugs.

Q   Let's just talk about Juan. What was Juan's problem—

A What was Juan—

Q   —in the past ?

A Same thing as Juvenal.

Q   I don't want to know about Juvenal. I just want to know about Juan. What was Juan's—why didn't you want—not want to deal with Juan?

A For the same reason as I told Juvenal.

Q   Alls you've told me is that Juan is a bad apple, and I'm asking you what it is that makes him a bad apple?

A Because he was in Seattle locked up in jail.

Q   And why was Juan locked up in jail in Seattle?

---

1.   "Tooley" was an alias or nickname for Juvenal Godinez.

A For drugs.

. . . .

Q Okay. Did Juan go to jail and was a bad apple before your husband went looking for him? Had that problem preceded him going to Michigan?

A No. That's a long time ago.

Q I'm not—

A So this is after.

Q Juan had gone to jail, and then your husband went looking for him—

A Yeah.

Q —after he got out of jail?

A No, no. Apparently this—what you're talking about, this happened seven years ago maybe.

Q Which happened?

A You know, when they were in jail in Seattle.

. . . .

Q And when did Juan go to jail?

A I believe in '88.

Q Okay. So at the time your husband went looking for Juan, he already—you already knew that Juan was someone convicted of drug dealing; right?

A Yes.

. . . .

Q How about a telephone call? Did he ever think of a telephone call? Maybe Juan could call up—

A He probably tried a couple times, but it was a cellular phone and never—

Q What was a cellular phone?

A The phone number that he gave. My husband told him that it was a cellular phone number.

Q Okay. Tooley was a bad apple, too; right? That's what you said.

A Yes.

Although no contemporaneous objection was made to the government's cross-examination, as soon as it was completed Juvenal Godinez's attorney moved for a mistrial. The motion was denied.

Since Enrique Godinez had offered an alternate non-criminal reason for his visit to Michigan, we find no error or impropriety in the government seeking to establish, through cross-examination, that it was unlikely and illogical that defendant would have travelled all the way from California to Michigan to look for a brother from whom he was trying to distance himself. It would appear, however, that the government did try, by innuendo, to convey that Juvenal, like his brother, Juan, also had been in previous trouble due to drug dealing. The government did this by referring to the fact that "Tooley was a bad apple, too" right after it had elicited that the other bad apple, Juan, had been in trouble with the law for drugs.

■ Although we find the final question asked by the government attorney to have been improper, we do not find that a mistrial was merited. By the time the jurors heard this relatively oblique reference to prior criminal activity by Juvenal, they had already heard several days of testimony from co-conspirators deeply implicating him not only as being involved in the drug conspiracy, but also as being its leader. We find that any error that occurred as a result of the line of questioning advanced by the government to have been harmless as a matter of law.

### V.

During its case in chief, the government established that one of the vehicles used to transport significant quantities of marijuana was a Pace Arrow motor home. This motor home was eventually seized in an attempted border crossing in Nogales, Arizona. The title history of the motor home was introduced as an exhibit by the government, and it listed the owners as "Jose Manuel Rios Gallardo" and "Rosalva Rios Gallardo." Additionally, the government introduced a personal history questionnaire taken by a deputy United States marshal in the process of booking Juvenal Godinez. One of the routine questions on the form asked for the name of the defendant's spouse, and he listed "Rosalva Rios." This disclosure served to further tie him to the motor home used to transport the marijuana.

■ It is defendant's contention that this evidence should not have been admitted as it constitutes a statement made by the

defendant when counsel was not present and also was a statement used by the government that was not provided to the defense counsel as part of pretrial discovery. We find no merit to either of these contentions. We have consistently held that routine biographical information elicited during the booking process does not constitute interrogation under a Fifth Amendment *Miranda*-rights analysis. *United States v. Clark*, 982 F.2d 965, 968 (6th Cir.1993); *United States v. Avery*, 717 F.2d 1020, 1024–25 (6th Cir.1983). The type of routine information elicited during the booking process does not involve questioning designed to elicit incriminating information from a defendant. Defendant's Sixth Amendment right to counsel was not violated by the elicitation of such routine information and by its subsequent introduction into evidence. In a similar vein, since the information offered into evidence was not elicited in response to interrogation, there was no obligation on the part of the government to provide this statement in pretrial discovery. Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure states:

> Upon request of a defendant the government must disclose to the defendant and make available for inspection, copying, or photographing: any relevant written or recorded statements made by the defendant ... [and] the substance of any relevant oral statement made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent....

It is clear that a literal reading of the Rule does not require the government to provide statements made by the defendant that were not made in response to an interrogation. *United States v. Green*, 548 F.2d 1261, 1267 (6th Cir.1977). The trial court did not abuse its discretion in allowing the booking questionnaire to be admitted into evidence.

## VI.

We turn now to the sentencing issues raised by Enrique Godinez on appeal.

■ Enrique was determined to have a base offense level of 26, based upon a factual finding by the trial judge that he was ac-

countable for the distribution of between 100 to 400 kilograms (220 to 880 pounds) of marijuana. Specifically, the court found that Enrique was directly involved with the distribution of 310 pounds of marijuana. Defendant admits to being involved with 160 pounds, but challenges the court's finding relative to the other 150 pounds. The finding of the trial judge in this regard is a factual finding which we review under a clearly erroneous standard. *United States v. Ledezma*, 26 F.3d 636, 646 (6th Cir.1994).

In addressing this issue we first note that the district judge did not hold Enrique responsible for the total amount of marijuana distributed by the conspiracy. The overall amount involved in the conspiracy was 1000 to 3000 kilograms of marijuana.

The 310 pounds of marijuana for which Enrique Godinez was held accountable involved two separate shipments of marijuana from California to Kalamazoo, Michigan. Both loads of marijuana were purchased by David Navarro, a Kalamazoo marijuana distributor, who testified for the government at trial. We first address the second shipment of marijuana, which Enrique admits was properly attributable to him. Relative to this shipment, Enrique and David Navarro drove from Kalamazoo to Palo Alto, California, in a red El Camino, and packed the marijuana in the vehicle. After it was packed, Enrique and another man drove the El Camino back to Kalamazoo, Michigan. Initially, 150 pounds of marijuana were packed in the vehicle, but defendant purchased and transported an additional 10 pounds of marijuana.

■ The first shipment from which Enrique attempts to distance himself was also loaded into and transported in the same red El Camino. The El Camino was driven from Palo Alto, California, to Kalamazoo, Michigan, by Enrique's nephew, Salvadore. Since the marijuana had been "fronted" to Navarro, Salvadore was to stay with Navarro until the marijuana was sold and make sure that the proceeds were returned to California. Although the money was to be paid to Juvenal Godinez, Salvadore told Navarro to contact Enrique if he could not get in touch with

Juvenal. During the time that Navarro was selling the marijuana and while Salvadore was staying with him, Navarro had a number of telephone conversations with Enrique. Navarro and Enrique and Juvenal Godinez were already planning a second transaction involving another 150 pounds of marijuana.

When Navarro finally sold all of the marijuana, he gave the final payment of approximately $9,000 to Salvadore to be returned to California. Salvadore left in the red El Camino, but he abandoned the car in Nebraska and disappeared with the cash. When Enrique learned of this, he telephoned Navarro and directed him to travel to Nebraska, retrieve the El Camino, and then deliver the El Camino to him in Sacramento, California. Navarro did as he was directed and subsequently spent a week with Enrique in Modesta, California, while preparing for the second 150 pound marijuana transaction.

There can be little doubt from this record that Enrique Godinez's direct involvement in the first shipment of marijuana was sufficient for the court to find by a preponderance of the evidence that he should be held accountable for the 150 pounds comprising the first shipment as well as the 160–pound second shipment. The trial judge did not have to find that this amount was a reasonably foreseeable objective of the conspiracy since he found that Enrique was directly involved with this first shipment.

### VII.

Enrique Godinez's final argument is that he should not have been given a three-level enhancement as a manager. The determination by the trial judge that defendant was a manager/supervisor is a factual one, and we review it under a clearly erroneous standard. *United States v. Cobleigh*, 75 F.3d 242, 251 (6th Cir.1996). Defendant not only argues he should not have been found to be a manager/supervisor, but also that he should have received a downward departure based upon being a minimal participant. We need spend little time in discussing this issue since the same evidence that indicated defendant's involvement in the two shipments totaling 310 pounds of marijuana would also serve as an adequate basis to support the court's determination that he was a manager or supervisor. It is clear that Juvenal Godinez was at the head of this conspiracy, and it is equally clear that the other members of the conspiracy looked to Enrique Godinez when Juvenal was not available. Enrique Godinez was involved in planning marijuana transportation and distribution activities as well as directing the others involved in the shipment and sale of the marijuana.

Unlike cases in which a defendant challenges his sentence after a guilty plea, in this case the judge heard all of the evidence introduced at trial against Enrique Godinez. From this evidence, the trial judge properly concluded that defendant directed the actions of other co-conspirators, exercised decision-making authority, and was clearly the contact person if Juvenal was not to be found. The trial record itself provided ample support for the court's determination that Enrique Godinez should receive a three-level enhancement for being a manager or supervisor.

**AFFIRMED.**