NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0553n.06

Case No. 24-1809

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Dec 03, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) | |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
|  | ) | EASTERN DISTRICT OF MICHIGAN |
| RICARDO ZAMORA, | ) | |
| Defendant - Appellant. | ) | OPINION |
|  | ) | |
|  | ) | |

Before: SUTTON, Chief Judge; GIBBONS and WHITE, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Ricardo Zamora appeals his conviction for conspiracy to distribute five kilograms or more of cocaine. On appeal, Zamora raises at least seven issues. He argues that he is entitled to a new trial because (1) the district court abused its discretion in denying his pro se motion to "disqualify" his counsel filed the day before trial; (2) the district court erred in denying his motion for a judgment of acquittal because there was insufficient evidence to sustain his conviction; (3) the district court erred in denying his motion for a new trial based on allegedly false testimony elicited by the government; (4) the district court erred in denying his motion for a new trial based on the presentation of evidence concerning his prior criminal history; (5) the government withheld *Brady* evidence; (6) the district court abused its discretion when it denied his motion for mistrial after it allegedly prejudiced the jury by referring to Zamora as guilty during *voir dire*; and (7) the district court erred in admitting certain testimony and evidence. Some of Zamora's arguments were not properly or timely raised before the district

court. Analyzing each of his arguments under the appropriate standard of review, we affirm his conviction.

I.

In July 2020, a grand jury indicted Ricardo Zamora, alleging conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841 and 846. The indictment alleged that Zamora participated in the drug conspiracy between March 2016 and August 2017. Zamora pled not guilty on June 4, 2021. By stipulation of both parties, trial was rescheduled four times, from an original date in August 2021 to July 2022. Before trial, the government filed a notice of its intent to seek a sentencing enhancement based on a prior conviction, as required by 21 U.S.C. § 851.

On July 6, 2022, Zamora moved to replace his attorney, Elias J. Escobedo, in a pro se "Motion to Disqualify Counsel," describing a "breakdown in communication and relationship." DE 35, Mot. to Disqualify Counsel, Page ID 151, 153–54. Zamora filed the motion the night before trial began. He alleged that Escobedo had only visited Zamora three times while preparing for trial and that Zamora and his family had unsuccessfully tried to contact Escobedo to no avail. Zamora further asserted that Escobedo had failed to carry out pretrial litigation and investigation, including filing a motion to suppress, and had not allowed Escobedo to review "flash drive material related to his case," his grand jury transcripts, or any *Jencks* material. *Id.* at Page ID 152. And, although Escobedo and Zamora both spoke Spanish, Zamora alleged that he could not understand Escobedo's explanation of the government's plea offer and its discovery material, until "[j]ust recently" when he "was able to find another prisoner who was able to translate his Discovery Material[s]." *Id.* at Page ID 151–52.

The next day, the court addressed Zamora's motion for new counsel before conducting *voir dire*. The prospective jurors were not present. Judge Stephen J. Murphy III[1] was critical of the motion from the start and became more so as his discussion with Zamora (conducted through a Spanish language interpreter) continued.

Judge Murphy sharply questioned Zamora regarding the author of the motion and whether he had threatened or paid someone in prison to draft it. Judge Murphy accused Zamora of lying about his proficiency in English. He labeled the motion a "chiste" and a waste of the court's time.[2] DE 64, Tr. Vol. 1, Page ID 775. After asking Escobedo about the allegations in the motion and hearing Escobedo say they were false, Judge Murphy stated that Escobedo was trustworthy and experienced and became even more irate with Zamora. Judge Murphy asked Escobedo if he agreed that Zamora's motion was a "chiste completamente." *Id.* at Page ID 778. He then asked Zamora: "You still think [Escobedo]'s doing a bad job. . . or would you rather rely on your chiste friend in the lockup who you don't know the name of? Yeah, you better bring something better if you're going to try this nonsense on the day before trial, I can tell you that right now." *Id.* at Page ID 780.

Next, Judge Murphy instructed the government to prosecute Zamora for obstruction of justice and stated:

> We have two lies within a document filed on the docket of the United States District Court. He's lying about who did it and who said it and what his understanding was. And after this trial is over, guilty or not guilty, I want this man prosecuted for an obstruction of justice.

---

[1] On July 28, 2025, Judge Murphy became Chief Judge of the Eastern District of Michigan.

[2] Judge Murphy asked the interpreter what the Spanish word for "joke" was and was told that it was "chiste." DE 64, Tr. Vol. 1, Page ID 775.

*Id.* at Page ID 781. Judge Murphy then told Zamora to tell his friends in jail "if they want to try this nonsense, they're going – they're going to suffer the consequences. And you better come up with the name of the man who wrote this for you ASAP." *Id.* Zamora asked Judge Murphy, "Can I say something?" *Id.* But Judge Murphy responded, "No. You have a lawyer to say something for you." *Id.* Judge Murphy denied the motion from the bench and proceeded to jury selection.

With the prospective jurors in the courtroom and while introducing the case, Judge Murphy twice referred to Zamora as guilty. Judge Murphy stated: "what the government is going to be attempting to prove and of which Mr. Zamora is currently presumed guilty is an agreement to deal or distribute narcotic substances that are illegal," and that Zamora "has a clean slate, no evidence against him, and he's a hundred percent guilty." *Id.* at Page ID 788–89. Both times, the court corrected itself immediately afterward, though only after being prompted by the government and by Escobedo. Judge Murphy apologized to Zamora, his counsel, and the jurors for his "brain freeze" and said that he would be "more specific with that as time goes on." *Id.* at Page ID 789. Escobedo orally sought a new jury and Judge Murphy took the motion under advisement as a motion for a mistrial.[3] The jury was selected, empaneled, and given preliminary instructions.

During the six-day trial, the jury heard from several of Zamora's co-conspirators: Myrna Taboada, Thomas Soulliere, and Oscar Gomez-Medina. In 2016, Taboada pled guilty to conspiring to distribute cocaine and heroin. She testified that Zamora had given her instructions to pick up money for him in May 2016, that Zamora and others had used her garage to unload money and drugs from Texas-Michigan car trips in May to July 2016, that she was present for an

---

[3] Judge Murphy construed the motion for a new jury as a "well grounded and well taken" motion for a mistrial. DE 64, Tr. Vol. 1, Page ID 794. On July 15, during trial, he issued a written order denying the motion for a mistrial and provided further reasoning for his denial of the motion to substitute counsel.

unloading of drugs and money in her garage in the presence of Zamora, and that Zamora once watched for police while a semi-truck unloaded concealed cocaine in a warehouse. Taboada also identified Zamora's voice in an audio recording concerning the quality of his drugs and how the identity of his drugs could be verified. Soulliere testified that he had been arrested in Texas while driving several kilograms of cocaine for Zamora. He further testified that he first met Zamora in the fall of 2015, and then, months later, met again and discussed transporting drugs from Texas. Soulliere agreed to transport drugs for Zamora and took multiple trips in 2016 in different cars. In October 2016, Soulliere was arrested during one of his trips. And Gomez-Medina testified that he and Zamora had spoken about "bringing cocaine from Texas," about how the cocaine was wrapped and delivered, and described the operations of the conspiracy at a higher level, with kilograms of cocaine flowing weekly. DE 69, Tr. Vol. 5, Page ID 1430, 1433–35. Gomez-Medina described traveling with Zamora to "look at a place" for the semi-truck delivery. *Id.* at Page ID 1447. Gomez-Medina also identified one of the speakers on the recording as Zamora.

The government also presented testimony from federal agents and camera footage. The agents' testimony was based on video, telephone, and GPS surveillance. For instance, FBI Agent Eli Bowers testified that investigators had set up pole cameras outside Zamora's residence and Taboada's residence, and that they had used GPS data from a rental car company to link a rented Volkswagen to Zamora before it was driven to Texas. Agent Bowers's testimony described Zamora's girlfriend, Vicky Roldan, as a "close associate" in the conspiracy, who coordinated with drivers, including Audrey Noel and Jessica Williams, to bring packages of cocaine hidden in rental cars from Texas to Detroit, and wired them money. DE 66, Tr. Vol. 2, Page ID 981–83, 988–91, 1013–15. DEA Special Agent Stacey Slater testified that she was present at the investigation when Noel and Williams were stopped at a checkpoint in Texas and cocaine was found in their Jeep, and

Agent Slater testified that Williams had texted Roldan that she was "taking one for the team" shortly before her arrest. *Id.* at Page ID 951, 1067; DE 67, Tr. Vol. 3, Page ID 1111–12.

Zamora did not testify in his own defense. Escobedo moved for a directed verdict of acquittal at the end of the government's case. The court denied it orally and in a written order.

The jury convicted Zamora of conspiracy to possess with the intent to distribute cocaine under 21 U.S.C. §§ 841 and 846. It also found that his prior conviction had resulted in a term of imprisonment of more than 12 months, from which he was released within 15 years of the beginning of the conspiracy. Zamora timely renewed his prior motion for a judgment of acquittal and moved for a new trial. The district court denied both motions.

After the verdict, the parties agreed to reschedule sentencing three times. Then, five days before the agreed-on sentencing date in June 2023, Escobedo moved to withdraw from his representation of Zamora and asked the court to appoint new counsel. Escobedo noted that Zamora had asked him to file motions alleging prosecutorial misconduct, which Escobedo deemed frivolous, and noted that there was a breakdown in the attorney-client relationship. The court granted this motion and appointed Zamora a federal public defender in June 2023.

Months later, in December 2023, Zamora filed a "supplemental" motion for a new trial. Judge Murphy sua sponte recused himself, and Judge Linda V. Parker was assigned to this case. Two days later, Judge Parker denied the supplemental motion as untimely.[4] Sentencing was reset, and in September 2024, Judge Parker sentenced Zamora to 180 months incarceration, followed by ten years of supervised release. Zamora timely appealed to our court.

---

[4] Zamora does not appeal the denial of this motion for a new trial as untimely.

II.

Zamora makes seven arguments on appeal. The government addresses the issues in a different order and also responds to Zamora's ineffective assistance of counsel arguments, which he did not raise in his statement of issues. We follow Zamora's organization of the issues, with some resulting repetition and cross-reference, and address the ineffective assistance of counsel argument at the end.

As an initial matter, most of Zamora's arguments on appeal were made for the first time in the "supplemental" motion for a new trial that he filed over a year and half after trial.[5] The relevant federal rule of criminal procedure provides that a new trial may be provided upon the defendant's motion "if the interest of justice so requires." Fed. R. Crim P. 33(a). Rule 33 also provides, however, that such a motion must be filed within 14 days of the jury's verdict, unless based on newly discovered evidence. *Id.* at (b)(2). The verdict was issued on July 19, 2022. Zamora made a timely motion for a new trial within 14 days, which was denied. The second motion for a new trial was not filed until a year and a half later, on December 27, 2023, and it did not reference any newly discovered evidence that could have supported filing outside the 14-day window.

We read Rule 33 "'in conjunction with Federal Rule of Criminal Procedure 45,' which allows district courts to revive and extend an expired deadline 'if the party failed to act because of excusable neglect.'" *United States v. Watts*, No. 21-5302, 2022 WL 706603, at *8 (6th Cir. Mar. 9, 2022) (quoting *United States v. Munoz*, 605 F.3d 359, 367 (6th Cir. 2010)). But in *Watts*, when

---

[5] The initial timely motion for acquittal re-raised Zamora's sufficiency of the evidence (credibility of witnesses) and presumption of guilt arguments, which had been made orally. The timely motion for a new trial raised arguments concerning witness credibility and argued for different jury instructions, specifically that Taboada's testimony should have resulted in a pattern jury instruction regarding an addict-informant and that the other collaborating witnesses' testimony was not corroborated. *See infra* Section II(C). Zamora's remaining arguments were raised for the first time in the untimely, second "supplemental" motion for a new trial.

analyzing a district court's denial of an *explicit request* to allow an untimely filing, this court pointed out that, in deciding whether to grant such relief, district courts are to consider four factors, one of which is the reason for the delay. *Id.* at *8–9. Because Zamora provides no reason for the delay in filing his renewed motion for a new trial, we consider the arguments made in his untimely motion as not made at all in the district court (and thus, subject only to review for plain error) unless also properly made earlier in the proceedings. *See United States v. Sittenfeld*, 128 F.4th 752, 778 (6th Cir. 2025).

III.

A.

We begin with the trial judge's decision to deny Zamora's motion to disqualify or substitute trial counsel. The Sixth Amendment trial right includes the "right to adequate representation and a right to choose one's own counsel." *Daniels v. Lafler*, 501 F.3d 735, 738 (6th Cir. 2007). The right to choose one's counsel, however, does not apply to an indigent defendant who obtains the assistance of court-appointed counsel. *Id.* at 739–740. To be sure, the right to adequate representation, along with the Due Process Clauses, independently prevents prejudicial interference with indigent defendants' counsel. *Id.* at 740. But as to substitution itself, we have held that "an indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate good cause to warrant substitution of counsel." *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990) (citation modified).

In this case, both parties advance their arguments under the standard set out in *United States v. Mack*, 258 F.3d 548 (6th Cir. 2001). Under that standard, a court analyzes a district court's denial of a motion to withdraw or substitute counsel for an abuse of discretion by considering four factors:

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*Id.* at 556. We address each factor in turn.

1.

This court has considered a motion filed one and a half months before trial to weigh against the defendant on the timeliness factor. *United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006); *see also United States v. Wells*, 55 F.4th 1086, 1091 (6th Cir. 2022). And a motion for new counsel is untimely when the court finds that a defendant, after a lengthy pretrial representation, waits until just before trial to file. *Chambers*, 441 F.3d at 447. Further, when the motion is made so last-minute that a continuance of trial would almost certainly be required, "the trial judge's actions are entitled to extraordinary deference." *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009) (quotation omitted). Zamora's motion for new counsel was filed the day before trial, after he had allegedly struggled to communicate with Escobedo for over a year since his attorney had been appointed. Although this factor weighs strongly against Zamora, it "is not, by itself, justification for denial of good cause." *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996) (*Jennings II*).

2.

We next consider the "adequacy" of the district court's inquiry into Zamora's motion to disqualify counsel. *United States v. Powell*, 847 F.3d 760, 778 (6th Cir. 2017). The district judge's analysis here was less than fulsome: he began by calling the motion a "waste of time." DE 64, Tr. Vol. 1, Page ID 771. But his questioning, while critical or even hostile, was aimed at a real issue: uncovering who had written the motion for Zamora. The trial judge asked how he could take a

motion "seriously" when Zamora would not provide any information about who had written it. *Id.* at Page ID 773–75. After criticizing Zamora for relying on someone with no legal training, the district judge moved to the substantive allegations, saying to Zamora's counsel: "Mr. Escobedo, as far as I'm concerned, this motion is a complete joke. However, it states that you did not meet with your client sufficiently." *Id.* at Page ID 776. Escobedo responded that Zamora's allegations about the lack of communication were false, he was very proficient in Spanish, that he was being forthright with Zamora about the strength of the government's case, and that, contrary to Zamora's claims, Zamora had in fact received the flash drive of discovery material. After hearing Escobedo's side of the story, the district court did not allow Zamora to speak, requiring him to speak through his attorney.

This inquiry falls short of that seen in other cases where we have found that the defendant was "allowed . . . adequate opportunity to explain his concerns." *See Chambers*, 441 F.3d at 447. To be sure, the district court's reluctance to give serious credit to a motion written or translated by an anonymous party is not improper considered alone.[6] And the trial judge asked Zamora's counsel for an explanation of the allegations in the motion. But the district court's refusal to question Zamora about the substance of his allegations or allow him a chance to respond to Escobedo's statements diverges from the cases in which we have upheld a denial of a motion to

---

[6] When evidentiary documents are translated, courts often require a certification of accuracy and language proficiency from the translator. *See Acosta v. Peregrino*, No. 3:17-cv-01381, 2020 WL 5995049, at *3 (M.D. Tenn. Oct. 9, 2020) (noting that courts in other circuits require translated witness testimony to be "authenticated" and "an accurate translation done by a competent translator") (citing *Jack v. Trans World Airlines, Inc.*, 854 F. Supp. 654, 659 (N.D. Cal. 1994)). This motion did not include any such certification, and when questioned Zamora did not provide any information about the translation except that it had been done in prison. Of course, pro se filings are to be construed liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). And the allegations in the motion did not need to be held to the standard of positive evidence. But we do not think it was categorically improper to give less weight to the motion in these circumstances.

change counsel. *See Vasquez*, 560 F.3d at 467; *United States v. Marrero*, 651 F.3d 453, 465 (6th Cir. 2011); *United States v. Price*, 761 F. App'x 568, 572–73 (6th Cir. 2019).

In *United States v. Liggins*, we stated that "where the district court is tasked with considering a defendant's request for new counsel, and determining whether it is necessary and appropriate to release the present defense counsel from his obligation . . . the district court should hear from the defendant." 76 F.4th 500, 507–08 (6th Cir. 2023). In this instance, the district court's back and forth with Zamora ended after it decided that he was lying about the motion's author. Once the district court came to this conclusion, the court cut Zamora off and asked to speak with his attorney. As for the attorney, the court discussed the motion for a time and ended the conversation once Escobedo said that Zamora had lied. At this point, the court instructed the government to prosecute Zamora for obstruction of justice. Zamora then asked if he could "say something?" DE 64, Tr. Vol. 1, Page ID 781. The court rejected his request, stating that Zamora had "a lawyer to say something for" him. *Id.* Considered in conjunction with the judge's animosity toward the motion, this factor weighs in Zamora's favor. This was not an in-depth inquiry—rather, it seems the district court did not take the motion seriously from the beginning.

3.

Because the relationship between defendant and counsel is essential to adequate representation, the conflict between the attorney and client is its own factor. This factor weighs against the defendant, however, unless the extent or nature of the conflict evinces "a total lack of communication preventing an adequate defense." *Vasquez*, 560 F.3d at 467–68 (quoting *United States v. Mooneyham*, 473 F.3d 280, 292 (6th Cir. 2007)).

Zamora's substantive complaints were that Escobedo had not met with him, had not provided him information, had not investigated his case, and had attempted to coerce him into

pleading guilty. Escobedo disagreed with this assessment, stating that he had been in contact with his client, that Zamora had the relevant flash drive material, and that the real communication issue was that Zamora did not "like" Escobedo's assessment of the amount and strength of evidence against Zamora. DE 64, Tr. Vol. 1, Page ID 776–77. The district judge decided not to credit the allegations in Zamora's motion (in part because Zamora did not provide information about who had prepared it) and relied instead on his prior experience with Escobedo to credit Escobedo's account. And, of course, as the government points out, Escobedo was able to participate actively in Zamora's defense. We hold that the district court did not abuse its discretion in determining that there had not been a complete breakdown in communication between Escobedo and Zamora at that time.[7]

4.

The final *Mack* factor is a balance of the previous factors with the public's interest in the timely administration of justice. In some overlap with analysis of the timeliness factor, a court here considers the burden on the judicial system resulting from a potential substitution of counsel. *Vasquez*, 560 F.3d at 468. Here, the trial court found that the government had carried out extensive logistical preparations for trial (including the disclosure of information about confidential

---

[7] We note that Escobedo moved after trial to withdraw, based in part on Zamora's demanding "additional post-trial motions that defense counsel has a fundamental disagreement with or finds imprudent. That is, Zamora has made allegations of prosecutorial misconduct at trial that defense counsel believes are frivolous and without any merit or evidentiary support." DE 59, Mot. to Withdraw, Page ID 645. The district court granted this motion before Zamora's sentencing. And the motion and the order both reference Zamora's pretrial motion. But because Zamora and Escobedo's disagreements about trial strategy occurred post-trial, that Escobedo ultimately withdrew does not weigh on whether the trial court abused its discretion in denying Zamora's pre-trial substitution motion.

witnesses) and that, because of the jury schedule in the district, a potential continuance could delay the trial up to a year. This factor weighs against Zamora.

We acknowledge that in a prior case in the same posture, this court remanded for an evidentiary hearing, directing a district judge to conduct a further inquiry into the relationship between defendants and counsel. *See United States v. Jennings*, 945 F.2d 129, 132 (6th Cir. 1991) (*Jennings I*) (stating that if the proffered reasons for the motion constituted good cause, new counsel and a new trial would be required). But the facts here fall short of those in *Jennings I*. There, the district court required the parties to submit letters regarding their dissatisfaction with counsel but never explicitly ruled on the motions and did not enter those letters into the record. 945 F.2d at 132. Because the district court undertook more of an inquiry than what took place in *Jennings I*, we conclude its analysis was not an abuse of discretion requiring remand on these grounds alone.

We thus hold that while district courts should generally engage in more inquiry than the district court did here, the denial of a last-minute motion contradicted by the movant's attorney and prepared by an anonymous party was not an abuse of discretion.[8]

### B.

Zamora's second argument on appeal is that the district court should have granted his motion for a judgment of acquittal at the close of the government's case. He argues that the government's cooperating witnesses—Taboada, Soulliere, and Gomez-Medina—lacked credibility. This argument mistakes the relevant standard. When a defendant moves for a judgment of acquittal after the government's case, the court is required to view the evidence that

---

[8] We also analyze the district judge's statements at this hearing in our discussion of Zamora's sixth argument on appeal. *See infra* Section III(F).

has been presented "in the light most favorable to the prosecution" and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vance*, 956 F.3d 846, 853 (6th Cir. 2020) (quotation omitted). And it is well settled that, in this posture, it is not appropriate for a court to determine whether particular witnesses are credible. *Id.*

Zamora was charged with conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841 and 846. To convict, the government was required to prove beyond a reasonable doubt "(1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020) (quotation omitted). In this case, the three collaborating witnesses testified that they had been in a conspiracy to traffic cocaine with Zamora. Soulliere testified that he had an "agreement" with Zamora to "drive a vehicle to the border, pick up cocaine and drive it back." DE 68, Tr. Vol. 4, Page ID 1291–92. Taboada testified that she had transported money for Zamora, and that he had been "pretty much using my house as a stash house or the garage as a stash." DE 67, Tr. Vol. 3, Page ID 1202, 1204. And Gomez-Medina testified that he picked up kilos of cocaine from Zamora at "a house he had on McGraw." DE 69, Tr. Vol. 5, Page ID 1435. In ruling on Zamora's motion for a judgment of acquittal, the district court viewed this evidence in the light most favorable to the government. *Vance*, 956 F.3d at 853. Zamora's core argument here is merely a challenge to witness credibility packaged as an insufficiency of the evidence claim. Consistent with our precedent, the district court faithfully declined to substitute its judgment regarding witness credibility and, instead, cabined its analysis to whether a reasonable trier of fact could find guilt beyond a reasonable doubt based on the government's evidence. The district court did not err in denying Zamora's motion for a judgment of acquittal.

We also note that under this section of his brief on appeal, Zamora argues that the district court should have used a model jury instruction that cautioned the jury regarding the weight of Taboada's testimony because of her status as a drug addict. This argument was also presented in Zamora's motion for a new trial after the jury's verdict. But the parties jointly stipulated to jury instructions.

We consider this an invited error, since Zamora contributed to it (without intentionally relinquishing his right) by stipulating to the jury instructions. *United States v. Carter*, 89 F.4th 565, 568 (6th Cir. 2023). And we will only review invited errors to "prevent manifest injustice." *Id.* at 570. But Zamora's counsel used the substance of the instruction to impeach Taboada's testimony during cross-examination. *See United States v. Talley*, 164 F.3d 989, 997 (6th Cir. 1999) (holding that the jury was "clearly able to assess [the witness's] credibility at trial" after counsel for defendant attacked witness's credibility during cross-examination). On cross-examination, Escobedo also highlighted Taboada's cooperation with the government, her past lies, and her substance abuse issues. Therefore, the district court's failure to provide alternative instructions sua sponte did not result in manifest injustice.

## C.

Zamora next argues that the district court should have granted a new trial based on false testimony by Gomez-Medina, who testified that he was dealing cocaine for Zamora while Zamora was in prison from 2010 to 2013. The government counters that this testimony was not material and, at best inconsistent, which does not warrant a new trial. The government is correct.

On direct examination, Gomez-Medina testified that he was in the "business" of "bringing cocaine from Texas" with Zamora in 2010 and 2011. DE 69, Tr. Vol 5, Page ID 1430–31. Then, Gomez-Medina testified, Zamora "went away for like four or five years" before resuming contact

in 2015. *Id.* at Page ID 1431. Around Christmas 2015, he testified, they began working together again, and the conduct continued into 2016. *Id.* at Page ID 1433–35. Zamora argues that he was in prison between 2010 to 2013 and could not have been working with Gomez-Medina during that period.

A defendant's due process rights are violated when the government deliberately deceives a court and a jury by knowingly presenting perjured testimony. *Monea v. United States*, 914 F.3d 414, 421 (6th Cir. 2019). But to prevail on this claim, a defendant must show "that the Government knowingly presented false testimony that materially affected the proceeding." *Id.* And even where such testimony is properly objected to (it was not here), the error may still be harmless. *See Rosencrantz v. Lafler*, 568 F.3d 577, 588–89 (6th Cir. 2009).

Zamora's argument fails for three reasons. First, he accurately states the standard, but his only argument as to why the statements would be material is that the government "alleged Mr. Zamora continuously conducted business with numerous people over the span of years, drug trafficking." CA6 R. 17, Appellant Br. at 35. But other testimony—namely that of Soulliere and Taboada—also established Zamora's role in the conspiracy, and he does not argue why the inaccurate dates would be material, which is his burden. *United States v. Coe*, 161 F.3d 320, 344–45 (6th Cir. 1998). In other words, Gomez-Medina's inaccurate testimony that Zamora was in a drug conspiracy years before the indicted conduct began is not per se material. Zamora needed to at least make an argument connecting the falsity to his conviction.

Second, on cross-examination, Escobedo made use of the inconsistency, impeaching Gomez-Medina with his testimony that he was transporting cocaine for Zamora during years in which Zamora was in prison. And indeed, the cross-examination had an effect. Gomez-Medina changed his position when confronted, stating that "[b]efore [Zamora] was in jail he was dealing

with me before. After he got out of the jail he contact[ed] me back again." DE 69, Tr. Vol. 5, Page ID 1522. Gomez-Medina also disclaimed exact knowledge: "I don't even know. I'm not here to lie." *Id.* at 1522–23. We have considered allegedly false testimony less pernicious when it is met with prompt and forceful cross-examination that brings inconsistencies to the jury's attention. *See United States v. Ward*, 190 F.3d 483, 491 (6th Cir. 1999).

Third and finally, Zamora needs to show that the testimony was more than a "mere inconsistenc[y]." *Coe*, 161 F.3d at 343 (quotation omitted). In context, Gomez-Medina gave the incorrect dates at first, but then later recharacterized his testimony as a period of working with Zamora, a delay while Zamora was in prison, and then a resumption of contact after Zamora was released. This argument does not merit a new trial.

D.

Zamora also argues on appeal that the procedure that was used to establish his prior conviction tainted the jury by exposing it to prejudicial information irrelevant to his guilt in the present case.

In addition to the drug conspiracy count alleged in the indictment, the government also sought to establish that Zamora qualified for a sentencing enhancement under 21 U.S.C. § 841(b)(1)(A) and (C), which provides for an increased sentencing range if a violation is committed "after a prior conviction for a serious drug felony or serious violent felony has become final" and "after a prior conviction for a felony drug offense has become final." The increased sentences are also subject to 21 U.S.C. § 802(58), which requires that, if the prior conviction is for a serious drug felony, the defendant must have served a term of imprisonment of over a year, and that the instant offense occurred within 15 years of release. Here, the government charged that Zamora had a Michigan drug conviction in 2010 for possession with intent to deliver a kilogram

or more of cocaine, and that he was paroled in September of 2013, within 15 years of the commencement of the offense with which he was charged.

In turn, 21 U.S.C. § 851 prescribes procedures for establishing prior convictions by means of a hearing without a jury present. But Zamora and the government agreed upon the methodology that was followed—one that would blend judicial and jury fact finding. Specifically, they agreed that the judge would find, as a matter of law, that a prior conviction occurred and that it qualified for the enhancement.[9] They further agreed that the jury would find, as part of its verdict, the length of imprisonment and whether the date of release was within 15 years of the commencement of the offense charged. This procedure was adopted because Zamora did not wish to stipulate to any matters regarding his prior conviction or sentence, and the parties wished to leave the factual issues of the length of confinement and the time of release for the jury. Zamora thus agreed that the jury would hear at least some evidence so that it could find the timing of his prior conviction.

Zamora argues on appeal that this procedure violated his rights and describes in detail a bifurcated procedure adopted by Judge Mark A. Goldsmith of the Eastern District of Michigan. Judge Goldsmith's procedure, as Zamora describes, waited until the jury had convicted the defendant of the present offense before presenting it with the prior sentence information for the factfinding relevant to the enhancement. Zamora argues that "[t]his procedure could very well have been followed" in his case. CA6 R. 17, Appellant Br., at 31. But even if true, it does not follow that merely because he might have preferred this procedure, any other procedure constitutes reversible error. Here, the government even contemplated waiting to present the prior conviction data to the jury until "after their initial verdict on the drug conviction." DE 66, Tr. Vol. 2, Page ID 1084. Yet Escobedo agreed to the procedure used, and Zamora did not challenge it until his

---

[9] Escobedo explicitly preserved an objection to this latter legal determination.

untimely second post-trial motion for a new trial. We decline to exercise our discretion to review this invited error. *See Carter*, 89 F.4th at 570.

Of course, the prior conviction was discussed at trial: in cross-examining Gomez-Medina, Escobedo had to allude to Zamora's time in prison. *See supra* Section II(C). This could have been grounds for an instruction requiring the jury not to consider that information for any other purpose than the dates of Zamora's sentence. But the distinct character of the prior conviction exhibits was highlighted to the jury by the district court. *See* DE 70, Tr. Vol. 6, Page ID 1595 ("[T]wo exhibits in front of [the jury] are special exhibits for a very limited purpose, Exhibit 50 and 51."); DE 85-1, Ex. 50–51, Page ID 2019–24; DE 41, Verdict Form, Page ID 259. Zamora concedes that Escobedo failed to object to the jury instructions. Thus, any defect is subject to plain error review. *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1076 (6th Cir. 2015). And we have previously held that the lack of a limiting instruction regarding the permissible purpose for which a jury may consider criminal history is not plain error. *Bronzino v. Dunn*, 558 F. App'x 613, 618 (6th Cir. 2014). We similarly hold here that the failure to instruct the jury as to the permissible evidentiary use of this information was not plain error.

E.

Zamora next argues on appeal that exculpatory or impeachment evidence regarding Gomez-Medina was not provided and that this represents a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). We review *Brady* claims de novo. *United States v. Tavera*, 719 F.3d 705, 710 (6th Cir. 2013). To establish a *Brady* violation:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*United States v. Paulus*, 952 F.3d 717, 724 (6th Cir. 2020) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). The government has an obligation to independently act and turn over *Brady* material, because it is required by "[f]undamental guarantees of due process" and because of the enormous asymmetry in information and investigative resources between prosecution and defense. *Tavera*, 719 F.3d at 710, 712. While the defendant thus does not need to request any information to trigger the *Brady* obligation, he must still indicate what exculpatory evidence was withheld to establish a *Brady* violation occurred. *See United States v. Thompson*, 758 F. App'x 398, 404 (6th Cir. 2018).

Zamora's most specific argument under his *Brady* claim is that the government made a representation that it would not call a particular confidential source but subsequently called Gomez-Medina to testify about an encounter in Detroit's Patton Park. Zamora concludes that Gomez-Medina must be that confidential source because his ultimate trial testimony was identical to the confidential source's report. Zamora claims that "[b]y presenting the testimony of both Gomez-Medina and Special Agent Gavin at trial, the government did not disclose exculpatory evidence, resulting in a *Brady* violation." CA6 R. 17, Appellant Br., at 40. This argument is difficult to parse as a *Brady* claim. The closest Zamora gets to saying what evidence was actually withheld is arguing that "the evidence is material and was in fact requested by Defendant." *Id.* at 41. But what evidence does he mean? The government contends that Escobedo "had all the Rule 16 and *Jencks* materials for the testifying witnesses." CA6 R. 23, Appellee Br., at 60. It could, however, conceivably be relevant if Gomez-Medina was the confidential informant that the government represented to Zamora would not be testifying. This is because no matter how much material on Gomez-Medina the government disclosed, Escobedo might not have realized he was

the Patton Park informant and therefore might not have been able to prepare to cross-examine Gomez-Medina about that meeting.

There are two problems with this argument. First, the prosecution asked Gomez-Medina about the Patton Park meeting during trial—in other words, the information was disclosed. "Generally, the *Brady* doctrine does not apply to a delayed disclosure of evidence that is favorable to the defendant, but only to a total failure to disclose such evidence." *United States v. Stamper*, 91 F. App'x 445, 451 (6th Cir. 2004). Zamora argues that if he had known ahead of time that Gomez-Medina would be testifying about this meeting, he would have had the "opportunity to properly prepare or confront" Gomez-Medina and "verify his alibi." CA6 R. 17, Appellant Br., at 41. But the materiality element of a *Brady* claim "does not pertain" to effective trial preparation, or even delay in the disclosure of exculpatory evidence until trial, unless the delay itself is prejudicial. *Stamper*, 91 F. App'x at 450 n.1, 451–52. And Zamora does not specifically argue prejudice beyond trial preparation.

Second, Zamora's allegations are vaguer than the specific evidence more typically concerned in *Brady* and *Giglio* cases. *See, e.g.*, *Paulus*, 952 F.3d at 725 ("The government concedes that the Shields Letter had 'potential exculpatory value' . . . ."); *Strickler v. Greene*, 527 U.S. 263, 273 (1999) ("notes taken by Detective Claytor during his interviews with Stoltzfus, and letters written by Stoltzfus to Claytor"). A successful *Brady* claim requires a more specific claim about what exculpatory evidence was withheld and the prejudice that followed from the withholding or delay.

Zamora's argument could also be viewed as a claim that the government violated its discovery obligations. But Zamora still does not state with specificity any material evidence that could have aided his defense beyond the fact that the government presented testimony from

Gomez-Medina and Special Agent Gavin. And Escobedo stated that he had no objection when the government told the court that they had provided him "all the" relevant *Jencks* and other required materials. DE 67, Tr. Vol. 3, Page ID 1141–42. Further, Escobedo cross-examined Gomez-Medina about his grand jury testimony, which was material he must have obtained through discovery as evidenced by his reading of it to Gomez-Medina during trial. On appeal, Zamora does not contend with the fact that Escobedo believed he had received all the discovery and *Jencks* material to which he was entitled. Zamora's claim therefore fails, regardless of whether it is construed as a *Brady*, *Giglio*, or discovery claim.

F.

Sixth, Zamora argues that the "totality of the circumstances" of the trial judge's statements "justifies a new trial." CA6 R. 17, Appellant Br., at 44. Specifically, Zamora argues that the court's statements in front of the venire—before the jury had been empaneled—"irreparably taint[ed] the jury" and, combined with the trial court's "other statements" from when he sought to substitute Escobedo before trial, violated his presumption of innocence. *Id.* at 43–44. The government argues that the only remedy Escobedo sought at the time—a new venire, since no juror had been selected yet—is not supported by our caselaw. Judge Murphy's relevant comments can be divided into two categories: first, his remarks to Zamora criticizing his last-minute motion to substitute counsel, and, second, the two times in close succession when the court (in the presence of the venire) described Zamora as "guilty."

We emphasize that Judge Murphy's conduct was hostile. The most egregious of his comments was likely his directive to the government to prosecute Zamora for obstruction of justice.[10] But his anger over Zamora's obtaining the assistance of another prisoner to seek

---

[10] No such prosecution of Zamora ever occurred.

appointment of another attorney is also hard to understand. Such filings are not uncommon, and are hardly an occasion for an emotional and hostile response. This sort of outburst is correctly labeled inappropriate judicial behavior.

In any event, Zamora argues only that the totality of the circumstances justified a new trial because Judge Murphy's comments violated his presumption of innocence. His support for this totality of the circumstances argument, however, comes from cases covering the presumption of innocence generally and from Court of Appeals for the Armed Forces cases regarding "implied bias" in the composition of a court-martial. While we granted a new trial in *Liggins*, we did so because Judge Murphy (the same judge as here) had abused his discretion in denying a motion for recusal. 76 F.4th at 509.[11] Zamora does not argue on appeal that Judge Murphy should have recused himself or that his failure to recuse merits a new trial.[12]

In contrast, Escobedo almost immediately moved for a mistrial after the trial judge twice mistakenly stated before the jury that Zamora was presumed guilty. But the trial judge promptly apologized to Zamora, made a correction, and otherwise formulated the presumption of innocence correctly. Although we find Judge Murphy's comments to Zamora criticizing his last-minute motion to substitute counsel to be highly inappropriate, he made those comments outside the jury's

---

[11] In *Liggins*, Judge Murphy berated a defendant after he made a last-minute request before trial to substitute counsel. 76 F.4th at 503–05. There, Judge Murphy stated that he was "tired of this case" and "tired of this defendant" giving him the "runaround"—he then denied Liggins the opportunity to speak instead of his lawyer, threatened to have him "hauled out of [court]," and, most significantly to the Sixth Circuit, stated that Liggins "look[ed] like a criminal to [him]" and was doing "what criminals do." *Id.* at 503. Here, Judge Murphy doubted Zamora's statements about his English fluency, called him a liar and his filing a "chiste" ("joke" in Spanish), and called for his prosecution. But in *Liggins*, unlike here, the defendant sought a new trial on appeal on the grounds that the trial judge should have recused himself. 76 F.4th at 505.

[12] We note that Judge Murphy recused himself at a later point in the case and did not sentence Zamora.

presence, and they therefore did not impact the jury's impartiality. *See United States v. Worthington*, 698 F.2d 820, 827 (6th Cir. 1983); *see also Sandstrom v. Montana*, 442 U.S. 510, 524 (1979) (explaining that the presumption of innocence requires the *trier of fact* to avoid adverse prejudgments against the defendant). And while the court's improper statements about the presumption of innocence are like those that bolstered our recusal holding in *Liggins*,[13] these immediately corrected statements do not rise to the level of tainting the jury in a way that requires a mistrial.

We review the denial of a motion for a mistrial for an abuse of discretion. *United States v. Robinson*, 99 F.4th 344, 360 (6th Cir. 2024).[14] We more typically consider the propriety of a mistrial in the context of witness testimony that could have prejudiced the jury and undermined the "fundamental fairness" of the trial, analyzing under multiple factors how the testimony was elicited and how prejudicial it could have been—and whether a curative instruction was promptly issued. *See Zuern v. Tate*, 336 F.3d 478, 486 (6th Cir. 2003). But a prompt and corrective instruction to the jury ameliorates potential prejudice in this context. For example, we have held that when a judge's comments about cumulative evidence or repetitious testimony in front of the jury may have given the jury the unwarranted impression that a party had carried its burden of proof, a curative instruction to the jury to disregard the instruction dispels prejudice. *United States v. Godinez*, 114 F.3d 583, 585–86 (6th Cir. 1997). This is especially true when the evidence against the defendant is "very substantial." *Id.* at 586. At least one other circuit has approved the

---

[13] Our reasoning in *Liggins* was "bolster[ed]" by the fact that in denying Liggins's motion for recusal, the judge had misstated the presumption of innocence—just as he did here shortly after denying Zamora's motion for substitution of counsel from the bench. 76 F.4th at 508 n.2.

[14] Because the implied bias standard comes from the military's Manual for Courts-Martial, R.C.M. 912(f)(1)(N), we find Zamora's argument inapposite and disregard his proffered military court cases.

denial of a mistrial when confronted with arguably prejudicial statements by a judge. *See United States v. Johnson*, 540 F.2d 954, 959–60 (8th Cir. 1976) (finding trial judge's substantive response to a defense objection did not require mistrial where "strong cautionary instruction" was used in charge to jury).

Here, Judge Murphy immediately said "Oh, that was in error . . . I made a mistake. The defendant is presumed not guilty and innocent of all these charges." DE 64, Tr. Vol. 1, Page ID 789. He misspoke again, and immediately apologized. *Id.* And soon after, he issued a written order denying the motion for a mistrial, labeling his comments as inadvertent misstatements and highlighting his immediate apology, instructions to the jury, and corrected formulation afterward. Although the comments were made right as the judge was introducing the case, they were also several days removed from the ultimate deliberation and occurred before either party had begun presenting its case. And the jury instructions correctly stated that a defendant accused of committing a crime is presumed innocent. We therefore conclude that the denial of a mistrial based on Judge Murphy's comments was not an abuse of discretion.

G.

Seventh, Zamora argues that the introduction of an audio recording and its authentication by Taboada and Gomez-Medina was speculation, and that the prosecution did not establish sufficient foundation for its admission. During the testimony of both witnesses, the prosecution played an audio recorded conversation, Government's Exhibit 27. The recording was made by a DEA informant wearing a wire to a meeting inside a car. The conversation discussed drug sales and quality; both Taboada and Gomez-Medina identified one of the voices captured as Zamora's.

Zamora argues that the prosecution tried to draw too much from this recording: the portions of the audio recording to which the prosecutor drew the jury's attention at closing as setting out

"exactly how in detail [Zamora] is guilty of this conspiracy" were not specifically authenticated as Zamora's voice, because the authentications concerned different parts of the conversation. CA6 R. 17, Appellant Br., at 47–48 (quoting DE 70, Tr. Vol. 6, Page ID 1613).

But Zamora stipulated to the admissibility of the exhibit. This would bar review on appeal under the doctrine of invited error. *See United States v. Macias*, 387 F.3d 509, 521 (6th Cir. 2004). And even if we consider his challenge to the government's more particular uses of excerpts of the tape to be separate and distinct, Zamora did not object while Taboada and Gomez-Medina were listening to the exhibit or when the prosecutor mentioned it at closing. It is well-settled that "[w]hen a defendant neglects to mount an objection to evidence at trial, he is precluded from arguing on appeal that its admission was flawed unless its allowance constituted plain error." *United States v. Carney*, 387 F.3d 436, 453 (6th Cir. 2004). So even if it had been wrong to admit this recording, Zamora would still have to succeed on plain error review. *See* Fed. R. Crim. P. 52(b). And he does not cite a case for any of the challenges he advances to this exhibit. Rule 901 provides that a witness can offer an opinion identifying a recorded voice "based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901(b)(5). Both Taboada and Gomez-Medina testified that they had dealings with Zamora before they identified his voice. Thus, the district court's admission of the audio recording was not plain error.

## H.

Finally, as the government points out, Zamora makes ineffective assistance of counsel arguments in his brief without explicitly raising this claim as part of his statement of the issues. He argues that certain decisions by Escobedo, like failing to object to the jury instructions, failing to adequately cross-examine Gomez-Medina and Agent Gavin, failing to sufficiently explain the

§ 851 procedure to Zamora, and failing to contest the value of the audio recording, all amount to ineffective assistance of counsel.

Indeed, multiple issues on appeal involve potentially damaging stipulations and failures to object. But we consider an ineffective assistance of counsel argument on direct appeal only where the record is already developed and complete enough to do so. *United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012). The current record does not support a conclusion that any of the alleged errors constitute constitutionally ineffective assistance of counsel per se.[15] We do not take a position on whether these decisions represent ineffective assistance of counsel without a more developed record illuminating whether counsel could have been motivated by trial strategy or other realities. *Id.* at 763; *see also United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006) ("Absent evidence specifically addressing counsel's performance, we cannot determine whether his actions reflected a reasoned trial strategy.").

In this case, both the district judge and defendant's counsel have changed since trial—but this means, if anything, that the record is incomplete as to this issue. If Zamora wishes to pursue an ineffective assistance of counsel claim, he should raise this claim in a later collateral proceeding under 28 U.S.C. § 2255. *See Lopez-Medina*, 461 F.3d at 737. We will not address the issue of ineffective assistance of counsel in this direct appeal.

IV.

For the foregoing reasons, we affirm Zamora's conviction.

---

[15] *Cf. United States v. Carthorne*, 878 F.3d 458, 465–66 (4th Cir. 2017) (noting the interplay of plain error and ineffective assistance standards).